## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| **HEWLETT-PACKARD COMPANY,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **BYD:SIGN, INC.; BYD:SINE, CO. LTD.,** | § | |
| **a/k/a BYD:SIGN, CO. LTD., a/k/a** | § | Civil Action No. 6:05cv456 |
| **BYD:SIGN COMPANY JAPAN, LTD,** | § | |
| **a/k/a BYD:SIGN WORLDWIDE; EYEFI** | § | ECF |
| **DIGITAL TV, INC.; IDAPT SYSTEMS,** | § | |
| **LLC; KATSUMI ELECTRONICS** | § | |
| **CORPORATION; J. BRIAN DENNISON;** | § | |
| **KARL KAMB, JR.; KATSUMI IIZUKA;** | § | |
| **MARC McEACHERN; WILLIAM** | § | |
| **TAFFEL; DAVID THORSON;** | § | |
| **POOJITHA PREENA,** | § | |
| | § | |
| **Defendants.** | § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff, Hewlett-Packard Company ("HP" or "Plaintiff"), by and through the undersigned counsel, brings this action against Defendants, byd:sign, Inc., a/k/a byd:sign, LLC ("byd:sign USA"); byd:sine, Co. Ltd., a/k/a byd:sign, Co. Ltd., a/k/a byd:sign Company Japan, Ltd., a/k/a byd:sign Worldwide ("byd:sign Japan"); Eyefi Digital TV, Inc. ("Eyefi"); Idapt Systems, LLC ("Idapt"); Katsumi Electronics Corporation ("KEC"); J. Brian Dennison ("Dennison"); Karl Kamb, Jr. ("Kamb"); Katsumi Iizuka ("Iizuka"); Marc McEachern ("McEachern"); William Taffel ("Taffel"); David Thorson ("Thorson"); and Poojitha Preena ("Preena") (collectively, "Defendants"), and would respectfully show the Court as follows:

**PLAINTIFF'S FIRST AMENDED COMPLAINT - PAGE 1**

## I.  <u>INTRODUCTION</u>

HP brings this action to redress a multi-million dollar swindle perpetrated by several of its once-trusted high-level employees.  While still employed by HP, these former high-level employees and their co-conspirators covertly organized and began operating a competing business venture using HP's resources, contacts and trade secrets.  These former high-level HP employees used their positions of trust, privilege and authority within HP to steal product designs, market analyses and other confidential and proprietary business information from HP and, in breach of their numerous common law, statutory and contractual duties, used this information to form and run their new enterprise.  Defendants' surreptitious looting of HP's corporate opportunities and misuse of HP's resources enabled Defendants to amass a multi-million dollar enterprise in only two years.  Without misappropriating the time, money and effort expended by HP, without abusing positions of trust at HP, and without engaging in disloyal, unfair and illegal business practices to HP's detriment, Defendants could not have achieved these results.

For over two years, the former high-level HP employees were able to hide their wrongdoing from HP by conducting their activities through a web of domestic and foreign corporations, by enlisting the aid of named and unnamed co-conspirators (including both U.S. citizens and foreign nationals), and by lying about their involvement in the enterprise when questioned by HP.  Defendants' wrongdoing, however, might have continued undetected if their ring-leader, Karl Kamb, had not been as disloyal and deceptive in his personal life as he was professionally.  HP did not discover Defendants' wrongdoing until HP received a subpoena from Kamb's wife in connection with their divorce proceeding that requested information about

Defendants' enterprise.  That subpoena led HP to investigate Kamb's and his co-conspirator's actions and to learn of the harm that Defendants' conduct has caused HP.

To redress this harm, HP brings the following claims in this action:

- usurpation of corporate opportunities;

- breach of fiduciary duties;

- constructive fraud;

- trade secret misappropriation;

- common law misappropriation;

- tortious interference with existing and prospective business relationships;

- breach of contract;

- negligent misrepresentation and fraud;

- unfair competition under the Lanham Act and the common law;

- civil conspiracy;

- violations of the Computer Fraud and Abuse Act; and

- violations of the Racketeer Influenced and Corrupt Organizations Act.

Had these former high-level HP employees acted in a loyal, fair and legal manner, HP—not Defendants—would have received the value of the employees' honest services, of HP's intellectual property, and of the corporate opportunities that Defendants usurped.  Instead, HP has suffered damages that may exceed $100,000,000.00.  In this action HP seeks to recover its actual damages, exemplary damages, treble damages, consequential damages, pre- and post-judgment interest, attorneys' fees and costs, and to impose a constructive trust on the business

enterprise that Defendants formed and operated in breach of their fiduciary duties and through the commission of other wrongs.

## II.   THE PARTIES

1.      Plaintiff HP is a Delaware Corporation with its principal place of business in Palo Alto, California.

2.      Defendant byd:sign USA is a limited liability company or corporation organized under the laws of the State of Texas with its principal place of business in Houston, Texas. byd:sign USA has been properly served and has filed an answer to the Original Complaint.

3.      Defendant byd:sign Japan is, on information and belief, a corporation organized under the laws of Japan having a principal place of business at 2nd Floor, BPS Building, 2-10-6 Tsukiji, Cho-Ku, Tokyo, Japan 104-0045.  Byd:sign Japan engages in business in this state, has been properly served and has filed multiple pre-answer motions in this action.

4.      Defendant Eyefi is a corporation organized under the laws of the State of Nevada having a principal place of business at 5100 Sparkling Dr., Las Vegas, NV 89130.  Eyefi, which engages in business in this state, has been properly served and has filed multiple pre-answer motions in this action..

5.      Defendant Idapt is a limited liability company organized under the laws of the State of Delaware having a principal place of business at 4104 24th Street, Suite 441, San Francisco, California 94114.  Idapt, which engages in business in this state, has been properly served and has filed a pre-answer motion in this action.

6.      Defendant KEC is a corporation organized under the laws of the State of Washington having a principal place of business at 740 Lakewood Dr. W., Lakewood,

Washington 98499.  KEC, which engages in business in this state, has been properly served and has filed a pre-answer motion in this action.

7.      Defendant Dennison is, on information and belief, an individual citizen of the State of Texas.  Dennison has been properly served and has answered the Original Complaint.

8.      Defendant Kamb is, on information and belief, an individual citizen of the State of Nevada.  Kamb has been properly served and has filed a pre-answer motion in this action.

9.      Defendant Iizuka is, on information and belief, an individual citizen of Japan who may be served at his principal place of business at 2nd Floor, BPS Building, 2-10-6 Tsukiji, Cho-Ku, Tokyo, Japan 104-0045.   Iizuka has been properly served and has filed multiple pre-answer motions in this action..

10.      Defendant McEachern is, on information and belief, an individual citizen of the State of California, currently residing in Japan.  McEachern has been properly served and flied an answer to the Original Complaint.

11.      Defendant Taffel is, on information and belief, an individual citizen of the State of Massachusetts.  Taffel has been properly served and has filed multiple pre-answer motions in this action.

12.      Defendant Thorson is, on information and belief, an individual citizen of the State of Nevada.  Thorson has been properly served and has filed multiple pre-answer motions in this action.

13.      Defendant Preena is, on information and belief, an individual citizen of the State of California.  Preena has been properly served and has filed a pre-answer motion in this action.

### III.    JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.  In addition, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

15.    Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims at issue occurred in this district.  Venue is also proper under RICO's nationwide service of process provision.  18 U.S.C. § 1965(a)-(b).

16.    This Court has personal jurisdiction over each Defendant.  The court has jurisdiction over each defendant because:  (1) Defendants have transacted and continue to transact business in Texas; (2) the causes of action asserted in this case arose from or are connected with purposeful and tortious acts committed by Defendants and/or their co-conspirators, in whole or in part, in Texas; (3) Defendants have committed a tort, directly and indirectly, in whole and in part, that caused substantial harm in Texas; and/or (4) Defendants have had continuous and systematic contacts with Texas by engaging in numerous activities that have had an effect in this State.  Accordingly, Defendants are amenable to service in this jurisdiction.

### IV.    BACKGROUND FACTS

**A.    HP is One of the World's Leading Technology Companies.**

17.    Founded as a partnership in 1939 by college friends, William R. Hewlett and David Packard, HP has grown to become a global technology leader with products ranging from personal computing, printing and imaging to IT infrastructure and digital entertainment.  Over the last seven decades, HP has earned a reputation as one of the most successful and trusted

technology companies in the world, and has invested billions of dollars and millions of man-hours to develop the cutting-edge technologies, processes and business strategies needed to achieve and maintain that reputation.  From its humble beginnings in a Palo Alto garage, HP has grown to employ over 140,000 people who serve more than a billion customers in more than 150 countries across the globe.

18.     On May 3, 2002, HP completed one of the largest technology mergers in history when it combined with Compaq Computer Corp. ("Compaq").  While the headquarters of the merged company remains in Northern California where HP began, HP continues to maintain a significant presence in Texas where Compaq maintained its headquarters.

**B.**     **Kamb, Taffel,  McEachern, Thorson and Dennison Once Worked Together as Employees of HP and/or one of Its Predecessors.**

19.     On or about May 9, 1996, Defendant Kamb began working for Compaq as a Retail Consumer Account Manager.  Before joining Compaq, Kamb held senior positions with other electronics companies where he was responsible for both operations and merchandising.

20.     When Kamb began working for Compaq, he signed an Intellectual Property Assignment and Confidentiality Agreement, assigning all of his rights in any intellectual property that he conceived while employed by Compaq to Compaq.  A true and correct copy of Kamb's Intellectual Property Assignment and Confidentiality Agreement is attached hereto as Exhibit "A."

21.     As Kamb rose through the ranks at Compaq, he obtained greater responsibility and was reposed with greater trust.  In the Fall of 2000, Compaq promoted Kamb to the position of Director of Business Development and assigned Kamb to Compaq's offices in Japan.  Shortly thereafter, Compaq promoted Kamb to the position of Vice President of Business Development.  As the VP of Business Development, Kamb was responsible for exploring and developing

business opportunities for Compaq relating to new technologies being developed in the Japanese market.

22.     Defendant Taffel was one of Kamb's subordinates assigned to Compaq's offices in Tokyo, Japan in the Fall of 2000.  As Kamb's subordinate, Taffel was also responsible for researching and evaluating new technologies in the Japanese market.

23.     In 1987, Taffel began working for Digital Equipment Corporation ("DEC"), a company that Compaq would later acquire.  From 1988 to 1995, Taffel served as a Finance Manager for DEC in Tokyo, Japan.

24.     Taffel took a short leave of absence from DEC in 1996, but returned to DEC in 1997.  Upon returning, Taffel signed an Employee Invention and Confidential Agreement, wherein he assigned "all title, interests and rights including intellectual property rights in and to any and all developments which are within the scope of [DEC]'s actual and anticipated business" to DEC.  As a result of acquiring DEC, Compaq acceded to DEC's rights under this agreement.  A true and correct copy of Taffel's Employee Invention and Confidential Agreement is attached hereto as Exhibit "B."

25.     Compaq acquired DEC in 1998, and after the acquisition, Taffel served as Director of Financial Processes & Systems for Compaq.  He would later rise to the level of Director of Strategic Finance & Planning at HP, following the HP/Compaq merger.

26.     When HP and Compaq merged in 2002, Kamb and Taffel became HP employees and remained in the same substantive positions with the same responsibilities that they held at Compaq.  In addition, as successor in interest to Compaq, HP acceded to Compaq's rights under Kamb's Intellectual Property Assignment and Confidentiality Agreement and Taffel's Employee Invention and Confidential Agreement.

27.     Defendant McEachern, like Kamb and Taffel, was employed in HP's facilities in Tokyo, Japan.   However, unlike Kamb and Taffel, McEachern was not a former Compaq employee.  Rather, McEachern began working for HP in January of 1993, and shortly thereafter, HP assigned McEachern to its operations in Tokyo.  McEachern ultimately rose to become the Director of HP Labs Japan.  In that role, McEachern was responsible for managing HP's research and development of electronic mobility and consumer electronics products in Japan and East Asia.

28.     On or about January 5, 2000, McEachern entered into an employment agreement with HP wherein he agreed to convey to HP "the right to obtain any patents, utility models, or registered designs arising out of any inventive conception related to the employment."  A true and correct copy of McEachern's Employment Agreement is attached hereto as Exhibit "C."  A translation of the Employment Agreement from Japanese to English is attached hereto as Exhibit "D."

29.     McEachern began working with Kamb and Taffel at HP's facilities in Tokyo following the HP/Compaq merger in 2002.  While Kamb and Taffel became integrated into HP's business development and marketing efforts, McEachern continued to be responsible for managing the more technical aspects of HP's product design and development.

30.      Defendant Thorson, like McEachern, was a pre-merger HP employee.  Thorson began working for HP in or about December of 2000 as an Alliance Development Manager, and during his tenure at HP, Thorson worked in several different HP business groups.  Ultimately, HP promoted Thorson to the position of Director of Strategy and Business Development where he managed a Global Alliance between HP and another leading technology company.  Thorson joined Kamb's division at HP in or about late 2003.

31.     Thorson, like the other HP employees entered into a confidentiality agreement with the company.  In the Agreement Regarding Confidential Information and Proprietary Developments dated December 14, 2000, Thorson agreed to hold HP's trade secrets and other proprietary information in "confidence and trust."  In addition, Thorson agreed to assign and promptly to disclose to HP any and all inventions, discoveries, designs and other intellectual property made by him or others during his employment with HP.  A true and correct copy of Thorson's Agreement Regarding Confidential Information and Proprietary Developments is attached hereto as Exhibit "E."

32.     Defendant Dennison, like Kamb and Taffel is a former Compaq employee, but unlike Kamb and Taffel, Dennison's tenure at HP was short-lived.  Dennison began working for Compaq in or about September of 1990 as a product analyst in Compaq's commercial desktop division and rose to the level of Vice President and General Manager of Compaq's North America Consumer Products Division during his roughly twelve-year tenure.  Dennison left HP in August of 2002, shortly after the HP/Compaq merger.  Upon information and belief, Kamb and Dennison became acquainted during the time that their employment overlapped at Compaq.

33.     Upon joining Compaq, Dennison signed an Employment Agreement wherein he agreed to assign and disclose to Compaq any and all intellectual property which pertained to Compaq's actual or anticipated business that he made or conceived during his employment. Dennison further agreed to refrain from competing with Compaq during his employment and for one year thereafter.  As stated above, as a result of the HP/Compaq merger, HP acceded to Compaq's rights under Dennison's Employment Agreement. A true and correct copy of Dennison's Employment Agreement is attached hereto as Exhibit "F."

34.     In or about late 2002 or early 2003, Dennison agreed to join Kamb and McEachern, who were still both HP high-level employees, in their effort to create a business with the primary purpose of producing and/or distributing flat panel televisions and related products—the business which would become byd:sign.

35.     Also in late 2002 or early 2003, upon information and belief, Defendant Preena became associated with Kamb.  In or about October 2003, Kamb arranged for Preena to be hired by HP as an independent consultant to perform various research and marketing tasks for Kamb's group at HP.  During his tenure as a consultant for HP, Preena entered into a Non-Disclosure Agreement wherein he agreed to refrain from disclosing confidential and proprietary HP information and to refrain from using such information for his own benefit.  A true and correct copy of Preena's Non-Disclosure Agreement is attached hereto as Exhibit "G."

**C.     Kamb, Taffel, McEachern and Thorson Agreed to Abide by HP's Standards of Business Conduct.**

36.     When Kamb, Taffel, McEachern and Thorson agreed to become employees of HP, they agreed to abide by HP's ethical standards of business conduct which are widely known to be among the most exacting standards in the industry.

37.     For more than 30 years, HP has recorded and published its ethical standards in a document entitled "HP Standards of Business Conduct."  The most recent version of the HP Standards of Business Conduct may be accessed on-line through HP's external website at http://www.hp.com/hpinfo/globalcitizenship/csr/sbcbrochure.pdf.  A true and correct copy of the HP Standards of Business Conduct, last revised in April 2005, is attached hereto as Exhibit "H."

38.     Kamb, Taffel, McEachern and Thorson each expressly agreed to abide by these rules while working for HP.

39.     Although the HP Standards of Business Conduct recognize that ethical business behavior requires a personal commitment from each employee that extends beyond the mere letter of any written rules, the rules expressly prohibit numerous improper activities.  For example, the HP Standards of Business Conduct expressly recognize that HP employees owe a duty of loyalty to the company, and that employees must avoid situations in which their loyalties may be divided between HP's interest and their own.  Among other things, an HP employee may not work for a competitor of HP or engage in any work outside of the company that might cause the employee to misuse HP's information or assets, or result in consequences unfair to HP. Moreover, the HP Standards of Business Conduct expressly forbid an HP employee from using any HP resources for outside employment or other activities, including computing and communication systems.  The HP Standards of Business Conduct also forbid any employee from taking, or advising others to take, any potential business opportunity that would otherwise be available to HP.  The HP Standards of Business Conduct also require HP employees to disclose any situation that could present a conflict of interest with their roles at HP.

40.     Further, the HP Standards of Business Conduct recognize that HP employees have a duty to safeguard HP's business and technical information, to keep such information confidential, and to use it only for HP's business purposes.  Information subject to this duty of confidence includes a wide range of non-public information such as financial data, business plans, operating reports, pricing information, marketing data, and business partner information. An HP employee may not share any sensitive HP information with anyone, except in accordance with HP's policies.

41.     Additionally, the HP Standards of Business Conduct recognize HP's ownership of intellectual property generated by an employee while working for the company.  Absent proper

<u>**PLAINTIFF'S FIRST AMENDED COMPLAINT - PAGE 12**</u>

written permission, an HP employee may not privately register or use intellectual property generated during the course of the employee's employment with HP.  The HP Standards of Business Conduct specifically forbid an HP employee from using any new name, slogan or mark for any product, program or service without first contacting and obtaining approval from HP's legal department.

**D.      In Late 2002 and Early 2003, Defendants Began Secretly Planning Their Enterprise.**

42.      Although the technology for producing flat panel televisions and monitors had existed for some time, these technologies were becoming more commercially available and marketable at about the time of the HP/Compaq merger in 2002.

43.      At that time, flat panel televisions and monitors were becoming particularly prevalent and available in Japan, where Kamb, McEachern and Taffel were supposed to be working for HP to find and develop new consumer electronic products for sale in the U.S. and world markets.

44.      Upon information and belief, however, in late 2002 or early 2003 and while employed by HP, Kamb, Taffel and McEachern, with the help of others, began formulating a scheme to establish their own consumer electronics enterprise.  This enterprise would be separate and apart from HP, and the enterprise would design, develop, manufacture and sell flat panel televisions, monitors and other devices obtained in Japan and East Asia—precisely the kind of products and opportunities that Kamb, Taffel and McEachern were supposed to be finding and developing on behalf of HP.

45.      Upon information and belief, while working for HP/Compaq in Japan, Kamb had made acquaintance with Iizuka, a Japanese citizen.  Iizuka, who had once worked for two separate Texas-based technology firms and who, upon information and belief, maintains significant contacts with the State of Texas, was the President and a member of the Board of

Directors of a Japanese corporation known as Dinner, Inc.  Upon information and belief, Dinner, Inc. manufactured and sold liquid crystal display ("LCD") monitors for computers, LCD television/computer monitor combinations and related accessories.

46.     In or about October 2002, Kamb arranged for HP to hire Iizuka as a consultant to provide market research regarding HP's competitors' operations in Japan.  Rather than pay Iizuka directly for his "services," Kamb arranged for HP to pay Dinner, Inc. for Iizuka's services.   Additionally, Kamb arranged for additional consulting fees (equivalent to approximately $10,000 per month) to be paid by HP to Iizuka through a consulting firm called "Imagine That" which, upon information and belief, was nominally run by one of Kamb's paramours.   Upon information and belief, Imagine That actually paid a portion of those "consulting fees" back to Kamb.  Iizuka remained on the HP payroll as a consultant for 6-8 months.

47.     In or about January 2003, Kamb, Taffel, McEachern and Dennison, upon information and belief, began discussions with Iizuka and others about forming a new company that they referred to as "byd:sign."  According to plans retrieved from Defendants' HP-issued computers—despite the Defendants' attempts to erase them—the proposed company was set up to manufacture and sell LCD televisions, plasma televisions, DVD players and other consumer electronics in the Japanese and U.S. markets.   Kamb and Dennison were slated to run the company's U.S. operations.

48.     At the same time, Kamb registered the Internet domain name "bydsign.com" in his own name.  Internet archive records indicate that, in early 2003, the "bydsign.com" website informed website visitors to email karl@bydsign.com with any questions.  Upon information and

belief, shortly thereafter, Kamb instructed Taffel to begin using bydsign.com email accounts to plan their activities.

49.     Kamb, Taffel, Thorson, McEachern and others, however, continued using their HP computers and email accounts to discuss and plan the byd:sign enterprise, to defraud HP and to misappropriate HP's proprietary information.   Once HP contacted some of the Defendants about their involvement in the byd:sign enterprise they attempted to erase all evidence of their wrongdoing by permanently and irretrievably deleting information off of their HP computers, likely through the application of a specialized software program designed to wipe, or "scrub," a hard drive clean.   HP, through the use of forensic data specialists, was able to retrieve and reconstitute some emails, instant messages, and computer files, which show that Defendants continued scheming and planning their venture through the Fall of 2003 and beyond, while many of the Defendants were still employed by HP, using their HP computers in furtherance of their scheme and plan.

50.     In or about March 2003, Kamb submitted an application in his own name to the United States Patent and Trademark Office to register the U.S. trademark on "byd:sign."  Over the following months, Kamb corresponded with the USPTO, and later, in or about May 2004, Kamb assigned the "byd:sign" U.S. trademark to byd:sign Japan and byd:sign USA.

51.     Upon information and belief, in or about April 2003, Kamb and his co-conspirators, including Dennison, Taffel, Iizuka, McEachern and Preena, finalized their plans for the byd:sign enterprise.   Those plans called for the formation of a parent company to be responsible for worldwide operations and subsidiary companies to be responsible for sales and marketing in the Americas; Asia; and Europe, the Middle East and Africa.  The plans identified Kamb, Iizuka and McEachern as founders and/or executive officers of the worldwide enterprise,

and Dennison and Preena as executive officers of the subsidiaries.  The plans further identified

the company's products as LCD televisions, LCD computer monitors and plasma televisions, and

anticipated full operations by mid- to late Summer 2003.

52.     In or about April and May 2003, while Kamb, Taffel and McEachern were still

employed by HP, Kamb, McEachern, Taffel, Dennison, Preena and Iizuka began pitching the

byd:sign enterprise to potential investors.   Upon information and belief, Kamb, Taffel and

McEachern did not identify themselves to potential investors as being employed by HP at that

time.  Moreover, the HP employees continued their consistent use of HP's computers and e-mail

system to further their illicit scheme by sending numerous e-mails and instant messages relating

to the solicitation and financing of byd:sign's business.  Additionally, during the time that they

were meeting with these potential investors, none of the HP employees involved in byd:sign

presented the idea to HP, proposed to HP that it undertake such an enterprise, or requested

funding for the enterprise from HP.  As stated above, by agreeing to abide by the HP Standards

of Business Conduct, Kamb, Taffel and McEachern were obliged, among other things, to refrain

from placing their personal financial interests above HP's interests by seizing an otherwise

available business opportunity from HP. Ignoring these obligations, Kamb, Taffel and

McEachern continued to use HP's resources, property and equipment to develop, discuss and

implement their secret plan.

**E.      In the Summer and Fall of 2003, Defendants Put Their Scheme Into Action While
        Continuing to Raid HP.**

53.     Upon information and belief, Kamb, Iizuka and others organized byd:sign Japan

in June of 2003.  At or around that time, Defendants, upon information and belief, had developed

an initial prototype LCD television and had finalized their plans to sell televisions through

byd:sign utilizing trade secrets and other confidential and proprietary information and intellectual property owned exclusively by HP.

54.     On or about August 26, 2003, byd:sign USA was formally incorporated in Texas. As contemplated by Defendants' earlier plans, upon information and belief, Dennison was made directly responsible for the domestic subsidiary.

55.     Having completed the plans, organized the companies, obtained funding and developed a prototype product for the byd:sign enterprise, Kamb made his next play at HP in or about August 2003.  Kamb, emboldened by his byd:sign activities, then informed his manager at HP that he was no longer happy with his role at HP, that he was not content with his compensation, and that he was not "feeling the love" that he felt he deserved.  Thus, Kamb suggested to his superior that he was thinking of pursuing other options.  Of course, Kamb did not reveal to HP that he, with the assistance of his co-conspirators, had already formed and was running byd:sign while still on HP's payroll.

56.     Believing that Kamb was still a loyal, valued and trusted executive employee, HP offered Kamb a raise and additional responsibilities at HP in an effort help him "feel the love" that he claimed to be missing.  Thus, HP gave Kamb greater responsibility over, and greater access to, HP's resources and information relating to HP's development of new technologies and strategic initiatives in Japan and Asia Pacific.  In addition, HP awarded Kamb a substantial, off-cycle pay increase.

57.     In or about September 2003, with byd:sign funded and operating, and with a promotion and raise at HP, Kamb finally presented the same flat panel television business strategy and product line to HP that he and his co-conspirators had already developed for byd:sign.  The HP executives to whom Kamb made his proposal reacted enthusiastically and

arranged for Kamb to present the plan to HP's Chairman and CEO, Carly Fiorina ("Fiorina"). Kamb still did not, however, reveal his personal interest in byd:sign to HP.

58.     On or about October 2, 2003, Kamb made his presentation to the upper-most management of HP, including Fiorina.  The presentation listed McEachern as Kamb's technical advisor.  Among the reasons Kamb cited for HP to enter the flat-panel television market was the recent success that HP's competitor, Gateway, Inc., had experienced in selling plasma televisions.  Kamb's presentation argued that entering the flat-panel television market was "logical" for HP, and that the strategy aligned well with HP's expertise in imaging and printing. Fiorina endorsed Kamb's proposal, and HP placed Kamb on the team in charge of developing that business strategy—unknowingly placing a fox in the henhouse.

59.     Placed in a position to influence decision-making regarding HP's efforts to enter the flat-panel television market, Kamb and McEachern began attempting to persuade HP to purchase televisions through byd:sign and its manufacturers, without disclosing their personal interests in the company.  In addition, Kamb arranged for Preena, who was already serving as an executive of byd:sign, to serve as a contractor for HP, giving the byd:sign conspirators even more access and opportunity to pillage HP's proprietary information.  Kamb also began sending highly confidential and proprietary information regarding HP's business plans, product designs and preferences directly to Iizuka and to others involved with byd:sign.

60.     Upon information and belief, as a cover for these activities, Kamb "hired" byd:sign Japan and its manufacturer, Xoceco, to perform consulting services for HP relating to the flat-panel television project.  Beginning in October 2003, byd:sign issued, through the use of mail, facsimile and/or computer, multiple invoices to HP totaling almost a quarter of a million dollars.  Additionally, upon information and belief, byd:sign caused its manufacturer Xoceco to

issue invoices to HP in the first quarter of 2004, for the same "services" byd:sign was providing to HP.  These invoices were made to Karl Kamb's attention, were sent to HP's offices in Palo Alto, California, and were made in incremental amounts which were within Kamb's payment authorization.  The Defendants structured the payments in this manner so that no further approval beyond Kamb was necessary.  These invoices included wire transfer instructions, payable to byd:sign Japan's bank account in Japan, which HP followed and tendered payment of the invoice amount from December, 2003 to the second quarter of 2004.  These invoices include descriptions related to the design, production and delivery of byd:sign's flat panel televisions. Upon information and belief, much of the work performed benefited only byd:sign and not HP. By approving payment of multiple invoices from byd:sign and its affiliates, upon information and belief, Kamb was siphoning research and development funds from HP for the benefit of byd:sign.  As a result of paying byd:sign and its affiliates more than a quarter of a million dollars for those "services" over the next three months, HP was unknowingly subsidizing byd:sign's research and development, allowing Defendants the opportunity to put their scheme into action in an expedited manner.   At no time prior to approving the payment of these invoices, did Kamb inform HP of his interest in the byd:sign enterprise.

61.    Upon information and belief, byd:sign began selling flat-panel LCD and plasma televisions in the United States and Japan in or about the first quarter of 2004, while Kamb and his team continued to "investigate" the feasibility of HP entering the flat-panel television market.

**F.    Defendants Continued Secretly Operating Their Competing Enterprise While Kamb, McEachern, Taffel and Others Remained Employed by HP.**

62.    Throughout 2003 and 2004, Kamb and his "team" at HP continued to investigate the flat-panel television market while byd:sign and its affiliates continued to sell flat-panel televisions in the U.S. and Japan.

63.     Upon information and belief, Kamb and McEachern continued to use their positions at HP, and HP's computer equipment, to funnel HP's confidential and proprietary information to byd:sign and its affiliates.  For example, in or about 2003, McEachern developed a design patent and subsequently submitted a design patent application to the Japanese Patent Office on behalf of HP, describing an original design of an LCD television with a tuner mounted on its back.  Even though McEachern and Kamb submitted the application on behalf of HP, unbeknownst to HP McEachern and Kamb had used the design to pitch and develop byd:sign's prototype televisions.

64.     During this same time period, Kamb and McEachern continued to serve as members of HP's Consumer Entertainment Display ("CED") group and to attend meetings intended to further HP's entry into the flat-panel display market.  During these meetings, the CED group discussed, among other things, highly confidential and proprietary information about the status of HP's development efforts.  Neither Kamb nor McEachern revealed their interest in byd:sign or their activities outside of HP at any of these meetings.

65.     Kamb, McEachern, Taffel and others continued their analysis of competitors in the flat-panel market, purportedly on behalf of HP, into the Fall of 2004.  Upon information and belief, however, Kamb and his co-conspirators continued to funnel their research, analysis and competitive intelligence to their byd:sign enterprise, by providing proprietary information to byd:sign employees through e-mail from their HP computers.  Moreover, upon information and belief, Kamb, Taffel and McEachern would frequently forward internal HP e-mail to their byd:sign email accounts and utilize this information in their competing enterprise.

**G.     In January 2004, HP Publicly Announced Its Intent to Enter Into the Flat-Panel Television Market.**

66.     On or about January 4, 2004 at the annual Consumer Electronics Show in Las Vegas, Nevada, HP CEO Carly Fiorina publicly announced HP's intent to enter the flat panel television market.  HP's display at the show included HP prototype LCD and PDP televisions, which, unbeknownst to HP, were the same televisions that had contemporaneously been manufactured for byd:sign with only the front bezels modified to include the HP logo.

67.     The January 2004 announcement by HP, one of the technology industry's most influential and innovative firms, received widespread attention.  Moreover, it confirmed what Kamb and the other byd:sign conspirators already knew—the flat-panel television market was well within the scope of HP's business and provided a substantial business opportunity for HP. Still, HP's entrance into the television industry failed to deter Kamb and his co-conspirators, who continued to operate the competing byd:sign enterprise and secretly siphon information, ideas and resources from HP.

68.     Kamb, McEachern, Taffel and others involved at HP received internal commendation and praise for their efforts in bringing HP into the flat-panel market.  This high praise, however, upon information and belief, only served to fuel the egos of the byd:sign conspirators who had long since turned their collective backs on HP, intent to line their own pockets at HP's expense.

69.     At no time after HP's public entrance into the television industry did Kamb, McEachern, Taffel or Preena inform HP of the existence of byd:sign.  This deception would continue for many more months with the conspirators continuing to hide and deny their affiliation with byd:sign.

**H.**     **Defendants' Deception Continued Through 2004 and Into 2005.**

70.     Upon information and belief, Kamb, McEachern, Thorson and others, while remaining employed by HP, continued to run and to expand the byd:sign enterprise and to misappropriate HP information and resources through the end of 2004 and into the Summer of 2005.

71.     In or about September, 2004, HP employees began development of a prototype product that required a flat-panel display.  Utilizing an HP prototype LCD television, HP engineers began development of this product.  Due to his status as an independent contractor at HP, upon information and belief, Preena came into contact with one of the project engineers and informed the engineer that he knew of a company which sold practically identical LCD televisions, byd:sign USA.  Upon information and belief, Preena, who at the time was working under Karl Kamb's direction, arranged for byd:sign USA to sell several televisions to HP, while never revealing his or Kamb's interest in the byd:sign enterprise.

72.     Upon information and belief, Iizuka assisted in the formation of KEC to serve as another U.S. affiliate of the byd:sign enterprise in or about November 2004.   KEC was responsible for the sales and distribution of byd:sign's televisions and consumer electronics in North America through a large consumer electronics chain.

73.     Further, upon information and belief, Kamb—though still an employee of HP— with the assistance of Thorson, Preena and Iizuka, successfully negotiated contracts on behalf of byd:sign with several recognized leaders in the consumer electronics, retail and communications industries to distribute and sell byd:sign televisions and other consumer electronics.  As a result, upon information and belief, byd:sign has entered into an agreement with one of the nation's largest consumer electronic retail chains, whereby the retailer sells—in its retail stores in this

district and elsewhere and via the internet—its own line of flat panel televisions designed and manufactured by byd:sign.

74.    While conducting these activities, Kamb continued to conceal his actions from HP.  In fact, in mid-March 2005, Kamb expressly denied having any affiliation with or interest in the byd:sign entities in response to direct questioning from another HP employee.

75.    Upon information and belief, in February 2005, Preena formed idapt as the arm of the byd:sign enterprise responsible for management, consulting, research and development, intellectual property and retail operations associated with byd:sign's digital television and emerging consumer electronic markets.

76.    In addition, in or about early 2005, Kamb and certain of his co-conspirators utilized HP resources and funds to develop and refine a modular television concept for HP. Upon information and belief, however, Defendants misappropriated that concept from HP and provided the concept to byd:sign.  Upon information and belief, byd:sign intends to offer a modular television in the United States and Europe as part of its next generation product line.

77.    In or about April 2005, Preena registered the Internet domain name "Eyefi.tv." Within two months, Eyefi Digital TV, Inc., upon information and belief a subsidiary of the byd:sign enterprise, filed articles of incorporation in Nevada, listing Kamb, Iizuka, Preena and Thorson among its directors, and identifying Thorson and Preena as executive officers.  Upon information and belief, Eyefi (along with KEC) now handles many of the sales, channel management, marketing, distribution, product strategy and brand management functions for byd:sign in North America.  Upon information and belief, the byd:sign conspirators also intend to use Eyefi to build and manage an on-line direct-to-consumer sales channel for byd:sign's televisions and other consumer electronics.  Upon information and belief, Thorson serves as the

CEO and President of Eyefi, and in July, 2005, Thorson obtained an HP printer from HP's product testing laboratory under the pretext that it would be used for HP related tasks.  Thorson, sent an e-mail to other HP employees in California requesting that they ship the printer via Federal Express to Kamb's home office in Las Vegas, Nevada where Eyefi was conducting much of its business.  Upon information and belief, obtaining a test version of HP's latest printer products gave the Defendants a distinct advantage for investigating and developing the new lines of business they sought to enter.

78.     Upon information and belief, the success of byd:sign's flat-panel television business has allowed byd:sign to begin venturing into additional lines of business, all of which are in direct competition with HP.  Upon information and belief, the byd:sign conspirators intend to continue competing unfairly with both HP's traditional and anticipated lines of business by using HP's trade secrets and other proprietary business information that they misappropriated during the course of their relationships with HP.

79.     For example, upon information and belief, Defendants have entered into negotiations with one of HP's long-time rivals to manufacture and sell printers that would compete directly with several of HP's Laser Jet printers.  In an effort to facilitate this plan, upon information and belief, under the guise of performing work for HP, on or about August 5, 2005, long after Eyefi was up and running, Thorson requested that a member of HP's division responsible for its printer products send him proprietary product and marketing information regarding HP manufactured printers.  Thorson forwarded the e-mail containing this information to Kamb's HP e-mail account, who then forwarded it to his byd:sign enterprise email account.

80.     In addition, upon information and belief, Defendants have sought to use technology and proprietary information, obtained through their relationships with HP, involving

an HP program known as "HomeSmart."  HP's HomeSmart project relates to the creation of a "digital home," where a media hub maintains, monitors and controls most of the home's electronic devices.  Kamb, Taffel, Thorson and Preena were all involved in HP's design and development of HomeSmart, and they recommended that HP acquire a smaller, third-party entity with specific expertise in this area to facilitate the implementation and sales of HP's HomeSmart product line.  Upon information and belief, Defendants misappropriated HP's proprietary HomeSmart concepts, business plans and technology and have contacted that same third-party entity in the hope of convincing it to market and distribute a digital home product with byd:sign.

81.     Defendants continued to conceal all of these activities from HP through the Summer of 2005.  In fact, in response to direct questioning from an internal security team at HP in or about August 2005, Kamb again denied having any relationship to byd:sign.  Kamb even stated that it would have been "a clear conflict of interest" for him to have any ownership in or involvement with byd:sign while remaining employed by HP.  This "clear conflict of interest," however, did not actually prevent Kamb and his co-conspirators from undertaking these activities.

I.     **Kamb's Personal Deceit Led to the Discovery of Defendants'**
       **Professional Deception.**

82.     On or about September 30, 2004, Kamb's wife, Susan Michelle Kamb, filed for divorce in Tarrant County, Texas where the Kambs maintained their residence.  Among the grounds for divorce, Mrs. Kamb cited "discord or conflict of personalities" and "adultery."

83.     On or about August 4, 2005, Mrs. Kamb served a subpoena in the divorce action on HP.  Among other things, the subpoena sought information relating to Kamb's activities at byd:sign.  Before receiving the subpoena in the Kambs' divorce action, HP had no reason to know of Kamb's and the other HP employees' involvement with byd:sign.

84.     HP's subsequent investigation has revealed substantial evidence showing the above-described history of tortious conduct by Kamb and others associated with byd:sign.  HP brings the present action to recover for the harm that Defendants' wrongful actions have caused it.

## V.     CAUSES OF ACTION

## FIRST CAUSE OF ACTION – USURPATION OF CORPORATE OPPORTUNITY

85.     HP realleges the preceding paragraphs as if fully set forth herein.

86.     Kamb, McEachern, Taffel and Thorson were high-level employees of HP.

87.     Kamb, McEachern, Taffel and Thorson knowingly, willfully and intentionally misappropriated business opportunities that properly belonged to HP, namely the opportunities to enter into the businesses that have become byd:sign Japan, byd:sign USA, Eyefi, KEC, *et al.*

88.     As the employer of these defendants, HP had a legitimate interest and expectancy in the misappropriated business opportunities.

89.     As one of the largest consumer electronics companies in the world, HP had the financial resources to take advantage of the misappropriated business opportunities.

90.     As a result of their tortious usurpation of HP's business opportunity, Kamb, McEachern, Taffel and Thorson have reaped financial benefits.

91.     As a result of Kamb, Taffel, McEachern and Thorson's usurpation of these business opportunities, HP has suffered commercial damage in the form of lost sales, revenues and profits. Kamb, McEachern, Taffel and Thorson performed these actions willfully, intentionally and with malice, warranting the imposition of exemplary damages.  In addition, the actions of Kamb, McEachern, Taffel and Thorson warrant the imposition of a constructive trust over byd:sign USA, byd:sign Japan, KEC and Eyefi.

## SECOND CAUSE OF ACTION – BREACH OF FIDUCIARY DUTY

92.     HP realleges the preceding paragraphs as if fully set forth herein.

93.     As employees of HP, Kamb, McEachern, Taffel and Thorson owed certain fiduciary duties of full disclosure; fair, honest dealing; candor; care; trust and loyalty and utmost good faith to HP.

94.     The failure of Kamb, McEachern, Taffel and Thorson to act in the best interest of HP in performing their duties as HP employees breached those fiduciary duties.

95.     HP has suffered significant damages as a result of the actions of Kamb, McEachern, Taffel and Thorson in breach of their fiduciary duties.  Kamb, McEachern, Taffel and Thorson performed these actions willfully, intentionally and with malice, warranting the imposition of exemplary damages.  In addition, the actions of Kamb, McEachern, Taffel and Thorson warrant the imposition of a constructive trust over byd:sign USA, byd:sign Japan, KEC and Eyefi.

## THIRD CAUSE OF ACTION – CONSTRUCTIVE FRAUD

96.     HP realleges the preceding paragraphs as if fully set forth herein.

97.     Kamb, McEachern, Taffel and Thorson were trusted employees and fiduciaries occupying positions of influence at HP.

98.     Kamb, McEachern, Taffel and Thorson abused those positions of trust to obtain confidential and proprietary information about HP and its business.

99.     Kamb, McEachern, Taffel and Thorson violated the confidences bestowed upon them as trusted employees of HP by using the information provided to them in confidence to create and run competing businesses—byd:sign USA, byd:sign Japan, KEC and Eyefi—to the detriment of HP.

100.    HP has suffered a loss as result of Kamb, McEachern, Taffel and Thorson's knowing, reckless and intentional deception, warranting an award of actual and exemplary or punitive damages and the imposition of a constructive trust over byd:sign USA, byd:sign Japan, KEC and Eyefi.

### FOURTH CAUSE OF ACTION – TRADE SECRET MISAPPROPRIATION

101.    HP realleges the preceding paragraphs as if fully set forth herein.

102.    Defendants' actions in taking and using HP's confidential and proprietary information and retaining that information constitute a misappropriation of HP's trade secrets.

103.    HP gained a commercial advantage from its confidential and proprietary information and Kamb, McEachern, Taffel, Preena and Thorson received access to that information in confidence.   Kamb, McEachern, Taffel, Preena and Thorson breached that confidence when they took and used confidential information and trade secrets of HP without HP's authorization or consent and despite HP's efforts to ensure that its confidential information and trade secrets remained confidential.

104.    HP has suffered significant damages as a result of Defendants' misappropriation of its confidential, proprietary and trade secret information.   Defendants' actions were willful, intentional and performed with malice and warrant the imposition of exemplary damages.

### FIFTH CAUSE OF ACTION – COMMON LAW MISAPPROPRIATION

105.    HP realleges the preceding paragraphs as if fully set forth herein.

106.    HP created its designs and products through extensive time, labor, skill and money.

107.    Defendants have used those designs and products in competition with HP, thereby gaining a special advantage in that competition because Defendants are burdened with little or none of the expense incurred by HP.

108.    As a result of Defendants' actions, HP has suffered commercial damage.

109.    Defendants committed this misappropriation knowingly, willfully, deliberately and with malice, warranting the imposition of exemplary damages.

### SIXTH CAUSE OF ACTION – TORTIOUS INTERFERENCE WITH EXISTING BUSINESS RELATIONSHIPS

110.    HP realleges the preceding paragraphs as if fully set forth herein.

111.    The conduct of Defendants as described herein was done willfully and intentionally in order to interfere with valid, enforceable contracts between HP and others.

112.    The result of Defendants' intentional and tortious interference with HP's existing business relationships is the proximate cause of commercial damage to HP.

113.    By reason of the foregoing, HP is entitled to recover the damage that Defendants have caused.  In addition, Defendants' actions warrant the imposition of exemplary damages because they were willful, intentional and performed with malice.

### SEVENTH CAUSE OF ACTION – TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS

114.    HP realleges the preceding paragraphs as if fully set forth herein.

115.    There was a reasonable probability that HP would have entered into business relationships with others with respect to the prospective lines of businesses described herein.

116.    Defendants performed the conduct described herein willfully and intentionally in order to interfere with these prospective business relationships between HP and others.

117.    Defendants' conduct, as described herein, was independently tortious or wrongful.

118.    The result of Defendants' intentional and tortious interference with prospective business relationships between HP and others is the proximate cause of commercial damage to HP.

119.    By reason of the foregoing, HP is entitled to recover the damage that Defendants have caused.  In addition, Defendants' actions warrant the imposition of exemplary damages because they were willful, intentional and performed with malice.

## EIGHTH CAUSE OF ACTION – BREACH OF CONTRACT

120.    HP realleges the preceding paragraphs as if fully set forth herein.

121.    Valid and enforceable contracts existed between HP and Dennison, Kamb, Iizuka, McEachern, Thorson and Preena.

122.    All conditions precedent to HP's right to bring this action and to recover the requested relief have been performed, have occurred, or have been waived.

123.    By engaging in the acts described in this Complaint, Dennison, Kamb, Taffel, Iizuka, McEachern, Thorson and Preena breached their respective contracts, including the non-compete provisions contained therein or ancillary to the agreements.

124.    As a direct and proximate result of Dennison, Kamb, Taffel, Iizuka, McEachern, Thorson and Preena's breach of their respective contracts, HP has suffered, and will continue to suffer, commercial damages.

125.    Because of Dennison, Kamb, Iizuka, Taffel, McEachern, Thorson and Preena's breach of their respective contracts, HP has been required to retain counsel at Fish & Richardson P.C. to prosecute its claims.  HP has agreed to pay its counsel for the reasonable attorneys fees and expenses incurred on HP's behalf in this lawsuit.  Pursuant to Texas Civil Practices &

Remedies Code § 38.001(8), HP is entitled to recover its reasonable and/or necessary attorneys'
fees and costs incurred in the prosecution of this lawsuit.

## NINTH CAUSE OF ACTION – NEGLIGENT MISREPRESENTATION

126.     HP realleges the preceding paragraphs as if fully set forth herein.

127.     Defendants made misrepresentations to HP in transactions in which Defendants
had a pecuniary interest, namely their competing business.

128.     Defendants supplied false information to HP for the purposes of guiding HP's
business decisions relating to the lines of business in which Defendants operated a competing
venture.

129.     Defendants did not exercise reasonable care in communicating this information to
HP.

130.     HP justifiably relied on the representations of Defendants in making its business
decisions in the lines of business at issue in this Complaint.

131.     Defendants' misrepresentations proximately caused HP to suffer commercial
damage recoverable in this action.

## TENTH CAUSE OF ACTION – COMMON LAW FRAUD

132.     HP realleges the preceding paragraphs as if fully set forth herein.

133.     Defendants made material misrepresentations to HP regarding the lines of
business at issue in this Complaint.

134.     Specifically, Kamb, Taffel and Preena arranged for numerous invoices to be paid
by HP to byd:sign Japan and byd:sign USA while never revealing their interest in the byd:sign
enterprise.   Defendants knowingly misrepresented the nature of the services that HP was

receiving from the byd:sign enterprise, and misrepresented their roles and interest in the enterprise.

135.    Additionally, Thorson materially misrepresented the purpose for which he was obtaining the HP test printer and the proprietary printer information.  HP relied on this misrepresentation and unknowingly provided a potential competitor with proprietary information about its printers, as well as a newly designed model.

136.    Defendants made the misrepresentations to HP with the intent that HP rely on them in making decisions.

137.    HP's justifiable reliance on Defendants' misrepresentations caused HP to suffer commercial damage.

138.    Defendants' fraudulent conduct described herein warrants an imposition of exemplary damages.

## ELEVENTH CAUSE OF ACTION – COMMON LAW UNFAIR COMPETITION

139.    HP realleges the preceding paragraphs as if fully set forth herein.

140.    Defendants' willful, intentional and illegal acts, as alleged in this Complaint, interfered with HP's ability to conduct its business, and constitutes unfair competition at common law.

141.    As a result of Defendants' willful, intentional and illegal acts, HP has suffered commercial damage for which HP may recover.  In addition, Defendants' actions warrant the imposition of exemplary damages because they were willful, intentional and performed with malice.

## TWELFTH CAUSE OF ACTION – LANHAM ACT UNFAIR COMPETITION

142.    HP realleges the preceding paragraphs as if fully set forth herein.

143.    The acts of Defendants in forming and operating their business through the misappropriation of HP's designs and products, as set forth above, misrepresents the origin and qualities of Defendants' products and designs in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

144.    Defendants use of HP's design in the stream of interstate commerce falsely designates and misrepresents the origin of Defendants' designs and creates a likelihood of confusion to those third persons to whom Defendants made such representations.

145.    Defendants committed the conduct described above willfully and said conduct is in violation of 15 U.S.C. § 1125(a).

146.    Defendants' willful violation of 15 U.S.C. § 1125(a) entitles HP to an award of its damages, Defendants' ill-gotten profits, treble damages, costs and reasonable attorneys' fees.

## THIRTEENTH CAUSE OF ACTION – CIVIL CONSPIRACY

147.    HP realleges the preceding paragraphs as if fully set forth herein.

148.    Defendants, together and with others not named as parties herein, entered into a combination or conspiracy to commit and facilitate the wrongful conduct described herein.

149.    This conspiracy manifested itself in many respects, including, but not limited to, the formation and operation of byd:sign USA, byd:sign Japan, KEC and Eyefi.

150.    Defendants, together and with their nonparty co-conspirators, reached a meeting of the minds on the foregoing objectives and course of action and, in connection therewith, committed one or more unlawful acts or otherwise lawful acts for unlawful purposes.

151.    Defendants, together and with their nonparty co-conspirators, committed the acts described herein with the knowledge or intent to injure HP or with reckless or negligent disregard for HP's rights and well-being.

152.    The conspiracy described above, and the acts committed in the course of that combination, proximately injured HP, for which HP seeks to recover compensatory and consequential damages.

153.    In addition, because the conspiracy among the Defendants and nonparty co-conspirators constituted fraud and the wrongful acts in furtherance thereof were committed maliciously, HP seeks to recover exemplary or punitive damages.

### FOURTEENTH CAUSE OF ACTION – VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO) ACT

154.    HP realleges the preceding paragraphs as if fully set forth herein.

155.    Kamb, Dennison, McEachern, Taffel, Thorson, Preena and Iizuka (the "RICO Defendants") engaged in a continuous pattern of racketeering predicated on violations that include, but are not limited to, 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

156.    Specifically, since the inception of the byd:sign enterprise, the RICO Defendants regularly and consistently used the mails, wires and other electronic means to conduct, further, and carry out their scheme to defraud HP and misappropriate HP's confidential information. This includes but is not limited to the use of the mails and/or wires to transmit fraudulent invoices submitted by byd:sign to HP, the shipment of HP's test product to Kamb for the benefit of Eyefi, Thorson's, and on information and belief, others' forwarding HP proprietary product information to Kamb who then forwarded the information to his byd:sign related e-mail account, and the countless other uses of mails, wires, computers, e-mails and telephones to further their fraudulent conspiracy and racketeering activity.

157.    The RICO Defendants implemented a scheme and possessed a specific intent to defraud HP, and used the mail and wires in furtherance of this scheme.  Additionally, each of the RICO Defendants conspired and agreed to commit some or all of these acts.

158.    Moreover, these continuous acts were all related to furthering the RICO Defendants' goal of defrauding HP.

159.    This pattern of racketeering activity was directly connected with the RICO Defendants' establishment, formation, and control of byd:sign U.S., byd:sign Japan, KEC, Idapt and Eyefi—five enterprises which have continuously engaged in various unfair business practices affecting interstate and foreign commerce.  These entities constitute an association-in-fact enterprise, the "byd:sign enterprise."  Moreover, the RICO Defendants are a group of individuals that create an additional association-in-factenterprise, separate and apart from the byd:sign enterprise.

160.    Each of the RICO Defendants have (a) invested income derived from the pattern of racketeering activity in the enterprise, (b) acquired and maintained an interest in the enterprise through the pattern of racketeering activity, (c) conducted the affairs of the enterprise through the pattern of racketeering activity; and/or (d) conspired to commit such acts.

161.    The RICO Defendants, byd:sign U.S., byd:sign Japan, KEC, Idapt and Eyefi are all engaged in interstate and/or foreign commerce, and their acts have affected interstate and foreign commerce.

162.    The RICO Defendants' actions constitute violations of 18 U.S.C. § 1962, and give rise to civil liability under 18 U.S.C. § 1964.

163.    HP's business and property have been inured by reason of the RICO Defendants' violations of 18 U.S.C. § 1962 and/or the predicate acts, and such conduct warrants an award of actual damages, treble damages and costs, including reasonable attorneys' fees.

## FIFTEENTH CAUSE OF ACTION – VIOLATION OF THE COMPUTER FRAUD AND ABUSE  ACT

164.    HP realleges the preceding paragraphs as if fully set forth herein.

165.    Defendants Kamb, McEachern, and Thorson (the "CFAA Defendants") each committed violations of 18 U.S.C. §§ 1030(a)(2)(C),  1030(a)(4) and 1030(a)(5).

166.    By continually and habitually using HP's computers to further their illicit and unlawful conspiracy and fraudulent scheme, the CFAA Defendants intentionally accessed HP's computers without authorization and/or in excess of their authorized access by virtue of their acting as agents on behalf of the byd:sign enterprise.

167.    Moreover, the CFAA Defendants attempted to "scrub" their HP computers, an act for which they were not authorized and which caused HP damage as a result of the deletion of extensive amount of HP information.

168.    The CFAA Defendants' conduct has harmed HP in excess of $5,000.

169.    As a result of the CFAA Defendants violations, HP seeks all compensatory damages, injunctive relief and equitable relief to which it is entitled.

## VI.    JURY DEMAND

170.    Plaintiff hereby demands trial by jury of all issues so triable.

## VII.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that the Defendants be cited to appear and answer, and that upon final trial, the Court find judgment for Plaintiff and against Defendants as follows:

a.    As a result of Defendants' wrongful actions, for Plaintiff for actual damages, consequential damages, exemplary damages, multiple damages, pre- and post-judgment interest, costs, and reasonable attorneys' fees;

b.    The imposition of a constructive trust on the businesses formed and operated as a result of Defendants' wrongful actions and on any and all securities, assets, revenues, profits or proceeds of such businesses; and

c.    For such other and further relief to which Plaintiff may show itself justly entitled, in law or in equity.

Dated:  August 28, 2006                    Respectfully submitted,

                                           FISH & RICHARDSON P.C.


                                           By:  /s/ Kelly D. Hine
                                                Thomas M. Melsheimer
                                                Texas Bar No. 13922550
                                                Stephen E. Fox
                                                Texas Bar No. 07337260
                                                Kelly D. Hine
                                                Texas Bar No. 24002290

                                                1717 Main Street, Suite 5000
                                                Dallas, TX  75201
                                                (214) 747-5070 (Telephone)
                                                (214) 747-2091 (Telecopy)


                                                Michael E. Jones
                                                mikejones@potterminton.com
                                                Texas Bar No. 10929400
                                                E. Glenn Thames, Jr.
                                                glennthames@potterminton.com
                                                Texas Bar No. 00785097

                                                POTTER MINTON
                                                A Professional Corporation
                                                110 N. College, Suite 500
                                                Tyler, TX  75702
                                                (903) 597-8311 - Telephone
                                                (903) 593-0846 - Facsimile

                                           Counsel for Plaintiff
                                           HEWLETT-PACKARD COMPANY

**PLAINTIFF'S FIRST AMENDED COMPLAINT - PAGE 38**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on August 28, 2006 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Local Rule CV-5(a)(3).

| | |
|---|---|
| Mark Torian<br>Sayles Werbner, P.C.<br>1201 Elm Street<br>44th Floor<br>Dallas, TX  75270 | Attorneys for Defendants<br>Idapt Systems, LLC and Poojitha Preena |
| David T. Alexander<br>MBV Law LLP<br>855 Front Street<br>San Francisco, CA   94111 | |
| Mark T. Josephs<br>William Ellerman<br>Jackson Walker L.L.P. (Dallas)<br>901 Main Street, Suite 6000<br>Dallas, TX  75202 | Attorney for Defendants<br>byd:sine, Co. Ltd., byd:sign, Co. Ltd.,<br>byd:sign Company Japan, Ltd., byd:sign<br>Worldwide; Eyefi Digital TV, Inc.,<br>Katsumi Iizuka, Marc McEachern, and<br>Karl Kamb, Jr. |
| William D. Coston<br>Jennifer Jesinoski<br>Venable LLP<br>575 7th Street, NW<br>Washington, DC  20004-1601 | Attorney for Defendants<br>byD:sign Inc. and J. Brian Dennison |
| Paul J. Kundtz<br>Riddell Williams P.S.<br>1001 Fourth Avenue Plaza<br>Suite 4500<br>Seattle, WA  98154-1065 | Attorney for Defendant<br>Katsumi Electronics Corporation |
| Ellen J. Zucker<br>Dwyer & Collora, LLP<br>600 Atlantic Avenue<br>Boston, MA  02210-2211 | Attorney for Defendant<br>William C. Taffel |
| John A. Irvine<br>Charles S. Baker<br>Porter & Hedges, L.L.P.<br>1000 Main Street, 36th Floor<br>Houston, TX  77002 | Attorneys for Defendant<br>David Thorson |

/s/ Kelly D. Hine
Kelly D. Hine

90188708.doc

**PLAINTIFF'S FIRST AMENDED COMPLAINT - PAGE 39**

# Exhibit A

**INTELLECTUAL PROPERTY ASSIGNME...**
**AND CONFIDENTIALITY AGREEMENT**

In consideration of my employment with Compaq Computer Corporation, a Delaware corporation, ("Company"), and for other good and valuable consideration, the receipt of which I hereby acknowledge, I agree as follows:

## INTELLECTUAL PROPERTY RIGHTS

1.  I hereby assign to the Company all my rights in all Intellectual Property which I make or conceive, whether as a sole inventor or as a joint inventor, whether made within or outside working hours or upon the premises of the Company or elsewhere, during my employment with the Company. This assignment shall not apply to Intellectual Property previously assigned to a former employer, provided that assignment is in writing and precedes this assignment. I understand and acknowledge that Intellectual Property means, for purposes of this Agreement, any information of a technical and/or business nature such as ideas, discoveries, inventions, trade secrets, know-how, and writings or other works of authorship which relate in any manner to the actual or anticipated business or research and development of the Company, its affiliates or subsidiaries.

2.  During and subsequent to my employment, upon the request and at the expense of the Company or its nominee and for no additional personal remuneration, I agree to execute any instrument which the Company considers necessary to secure for or maintain for the benefit of the Company adequate patent and other property rights in the United States and all foreign countries with respect to any Intellectual Property. I also agree to assist the Company as required to draft said instruments and to obtain and enforce said rights.

3.  I agree to promptly disclose to the Company any Intellectual Property when conceived or made by me, in whole or in part, and to make and maintain adequate and current records thereof. Upon the termination of my employment, I agree to promptly turn over to the Company all models, prototypes, drawings, records, documents, and the like in my possession or under my control, whether prepared by me or others, relating to Intellectual Property, and any other work done for the Company related thereto. I acknowledge that all such items are the sole property of the Company.

4.  I agree that any Intellectual Property disclosed by me within one (1) year following termination of my employment shall be the sole property of the Company unless and until finally determined by a court of competent jurisdiction to have been made or conceived after the termination of my employment.

## NON-DISCLOSURE

During and subsequent to my employment, I agree not to use or disclose any Intellectual Property of a confidential or trade secret nature generated or acquired by or disclosed to me during the course of my employment, except to the extent that such use or disclosure is necessary to fulfil my responsibilities as an employee of the Company. I understand that confidential matters and trade secrets include information not generally known by or available to the public about or belonging to the Company, or belonging to other companies to whom the Company may have an obligation to maintain information in confidence, and that authorization for public disclosure may only be obtained through the Company's written consent. I also agree not to disclose to the Company any confidential or trade secret information or material belonging to others.

## NON-SOLICITATION

I agree that for a period of three (3) years following the termination of my employment, I will not (i) solicit, encourage, or take any other action which is intended, directly or indirectly, to induce any other employee of the Company to terminate his or her employment with the Company; or (ii) interfere in any manner with the contractual or employment relationship between the Company and any other employee of the Company.

## MISCELLANEOUS

1.  I understand and agree that my employment can be terminated by the Company at any time, with or without cause and with or without prior notice.

2.  I agree that the law of the State of Texas shall govern this Agreement and that exclusive jurisdiction with respect to any legal proceeding regarding this Agreement shall rest in the State of Texas.

3.  I agree that this Agreement supersedes any agreement or understanding previously existing between the Company and me relating to the matters contained herein.

4.  I agree that this instrument is the whole agreement between the Company and me and that no modification or variation shall be deemed valid unless provided for in a subsequent written agreement.

5.  I agree that this Agreement is binding upon my heirs, executors, administrators, and legal representatives.

6.  I agree that if any provision of this Agreement is held to be unenforceable, the validity of the remaining provisions shall not be affected by such holding.

7.  By signing this Agreement, I represent and warrant that I am not under any obligation to any person or other third party and do not have any other interest which is inconsistent or in conflict with this Agreement, or which would prevent, limit, or impair my performance of any of the covenants hereunder or my duties as an employee of the Company.

EMPLOYEE NAME - PRINTED

KARL KAMB

(EMPLOYEE SIGNATURE)

5-9-96

(DATE)

INTELLEC.HEL

# Exhibit B

**digital**

# EMPLOYEE INVENTION AND CONFIDENTIAL AGREEMENT

In consideration of my employment by Digital Equipment Corporation ("DIGITAL"), a Massachusetts corporation, and in consideration of compensation paid in connection with my employment, advances and reassignments offered during the term of my employment, I hereby agree as follows:

1. I will make full and prompt disclosure to DIGITAL of all inventions, improvements, mod-ifications, discoveries, creations, methods, processes and developments (all of which are hereinafter collectively termed "developments") which are within the scope of DIGITAL's actual and anticipated business, and which are made or conceived by me alone or with others during the term of my employment, whether or not such developments are patentable or protected as confidential information, whether or not such developments are made or conceived during normal working hours or on the premises of DIGITAL, and whether or not such developments are assignable to DIGITAL under the provisions of Paragraph 2 below.

2. I agree to assign and hereby assign to DIGITAL all title, interests and rights including intellectual property rights in and to any and all developments which are within the scope of DIGITAL's actual and anticipated business, and agree to assign to DIGITAL any patents or patent applications arising from such developments, and agree to execute and deliver such assignments, patents, patent applications, and other documents as DIGITAL may direct, and agree to cooperate fully with DIGITAL both during and after the term of my employment, to enable DIGITAL to secure and maintain rights in said developments in any and all countries. However, my agreement to assign, as set forth above, shall not apply to any inventions (as defined in 35 USC Sec. 101) which were conceived and developed without the use of DIGITAL's equipment, supplies, facilities, and trade secret information and which were developed entirely on my own time, unless (a) the inventions relate (i) directly to the business of DIGITAL, or (ii) to DIGITAL's actual or anticipated research or development, or (b) the inventions result from any work performed by me for DIGITAL. Further, the assignment provision of this Paragraph 2 shall not apply to inventions exempt from assignment under the applicable laws of the state of employment. I agree, however, that DIGITAL shall have a non-exclusive, fully paid license to use for all purposes any inventions within the scope of DIGITAL's actual and anticipated business but not assigned to DIGITAL under this Paragraph 2, unless such a license is prohibited by statute or by a court of last resort and competent jurisdiction.

3. I understand and agree that DIGITAL shall determine, in its sole and absolute discretion, whether an application for patent, for copyright, for mask work registration, or for any other intellectual property right shall be filed on any development which is assigned to DIGITAL under this Agreement, and whether such an application shall be prosecuted or abandoned prior to issuance or registration.

4. I hereby represent to the best of my knowledge, that except for those obligations identified and fully described in Exhibit A to this Agreement, I have no present obligation to assign to any former employer, or any other non-DIGITAL person, corporation or firm, any developments covered by Paragraph 2.

5. I acknowledge that all works of authorship and all mask works that fall within the scope of my employment are owned by DIGITAL and are works made for hire. Accordingly, I agree to assign and hereby assign to DIGITAL any and all copyright rights and mask work registration rights, and all other mask work rights (except as may be exempted from assignment under Paragraph 2 above) in all material prepared by me during the term of my employment which relates directly to the business of DIGITAL, or to DIGITAL's actual or anticipated research or development, or which was prepared with equipment, supplies, facilities, or know-how of DIGITAL.

6. I will not disclose to DIGITAL, or induce DIGITAL to use, any confidential information of other persons, corporations, or firms including my former employers (if any).

7. During the course of employment by DIGITAL, I may learn of DIGITAL's confidential infor-
mation or confidential information entrusted to DIGITAL by other persons, corporations, or
firms. DIGITAL's confidential information includes matters not generally known outside of
DIGITAL, such as experimentation, research and developments relating to existing and future
products and services marketed or used by DIGITAL, and also any information which gives
DIGITAL a competitive advantage including data relating to the general business operations
of DIGITAL (e.g., sales, costs, profits, organizations, customer lists, pricing methods, etc.).
I agree not to disclose any confidential information of DIGITAL, or of others which is entrusted
in confidence to DIGITAL, to any non-DIGITAL person, corporation, or firm. I further agree
not to make use of such confidential information except on DIGITAL's behalf whether or not
such information is produced by my own efforts. I understand and agree that my confidentiality
obligations under this Paragraph 7 shall continue both during employment and after termi-
nation of employment until such confidential information becomes generally available to the
public through legitimate means. It is understood and agreed that specific information which
I may receive, observe, perceive, create, develop, or learn while an employee of DIGITAL
shall not be deemed to be generally available to the public merely because such specific
information is embraced by more general information which is generally available to the
public.

8. At the time I begin my employment and during the term of my employment by DIGITAL, I
will not become employed by or act on behalf of any other person, corporation, or firm which
is engaged in any business or activity similar to or competitive with that of DIGITAL, unless
such employment has been approved by DIGITAL in a writing signed by an officer of DIGITAL.

9. In the event that my employment is transferred by DIGITAL to a subsidiary or affiliated
company (as the case may be), I shall execute an employment agreement having, to the
extent allowed by the local laws of the country of such company, terms substantially similar
in substance to the terms of this Agreement. Developments arising from my employment
with DIGITAL shall continue to be governed by the terms of this Agreement, while devel-
opments arising from my employment with such company shall be governed by my employ-
ment agreement with such company.

10. I hereby give DIGITAL and its assigns permission to use my voice, image, or likeness, either
during or after my employment, with or without using my name, for whatever business
purposes it deems necessary.

11. Upon termination of my employment, I agree to deliver to DIGITAL all records, drawings,
notebooks and other documents (without retaining copies) which pertain to DIGITAL's con-
fidential information (whether prepared by me or others), and also to return to DIGITAL any
equipment, tools, or other devices owned by DIGITAL and in my possession. I agree that
the above documents and devices are the exclusive property of DIGITAL and shall not be
copied or removed from company premises except in the pursuit of the business of DIGITAL.
It is understood, however, that to the extent that such documents and devices are necessary
for my employment upon transfer to a subsidiary or affiliated company of DIGITAL, I may
retain possession of, and use, such documents and devices pursuant to the terms and
conditions of my employment agreement with such company.

12. My obligations under this Agreement shall survive the termination of my employment re-
gardless of the manner of such termination, and shall be binding upon my heirs, executors
and administrators.

I have read and understand the terms of the above agreement, and by my signature below I
agree to such terms and acknowledge the receipt of a copy of the state laws (if any) relating to
the assignment of inventions in the state of my employment.

Employee -

Signature _____  Date 9/22/97   Witness Signature _____  Date 9.22.97

Full Printed Name WILLIAM C. TAFFEL   Badge 213718   Full Printed Name J. Hamilton   Badge 152228

EN-01078-06-REVD(846)

# Exhibit C

<u>CARD NO. 00424533</u>　　　　　　　　　　　2000年　1月　5日

# 労 働 契 約 書（従業員）

（甲）日本ヒューレット・パッカード株式会社
　　　代表取締役社長　寺澤　正雄

　　　　　　　　　　　　　　　（乙）氏名 マッキーチャン・マーク 

甲と乙は、下記によって労働契約を締結する。

記

1．甲は乙を就業規則、その他の諸規程の定めるところによって、2000年　1月　1日から
　従業員として雇用するものとする。
　但し、2ヶ月間は試用期間とする。
　甲は、試用期間中の乙が従業員として不適と認めるときは、何時でも雇用を解くことができ
　るものとする。
2．乙の雇用条件は、就業規則、その他の諸規程によるものとする。
3．乙は甲の定める就業規則、その他の諸規程及び次の事項を承認し、就業するものとする。
　① 営業上、技術上その他いっさいの機密は、在籍中はもちろん退職後といえども、直接間
　　接を問わず決して他にもらさないこと。
　② 上長の指示に従って職場の秩序を維持するとともに、常に技術の向上及び能率の増進に
　　努め、その職責を遂行すること。
　③ 業務上の発明考案をなした場合、これに基づく特許を受ける権利、実用新案または意匠
　　の登録を受ける権利を、会社に譲渡すること。
　④ 業務上に属さない発明考案をなした場合、これに基づく特許を受ける権利、実用新案ま
　　たは意匠の登録を受ける権利、または特許権、実用新案権、意匠権を他人に譲渡しよう
　　とする場合、及びこれらの権利の実施を他人に許諾しようとする時は、第三者に優先し
　　て会社と協議すること。
　⑤ 甲の業務範囲に属する事項について、個人としてその業または内職などを営まないこと。
　⑥ 乙が提出した履歴書、入社志願書、その他の書類の記載事項ならびに選考の際申し述べ
　　た事項が事実と相違していた場合は、解雇されても異存ないこと。
　⑦ 乙は退職時に、甲指定の様式により、退職後の機密保持に関する契約を締結すること。
4．本契約締結後、労働条件、就業規則、その他の諸規程が改定されたときは、甲、乙ともそれ
　によるものとする。

　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　以　上

# Exhibit D

January 5, 2000

## Employment Agreement (Employee)

(Party A) Hewlett Packard Japan KK
      Director, President    Masao Terazawa

(Party B) Name   Mark McEachern

Party A and Party B conclude an Employment Agreement as follows.

### Terms

1. Party A will employ Party B as an employee in accordance with office regulations and other rules starting on January 1, 2000.
    However, the first 2 months shall be a trial period.
    During the trial period, if Party A finds Party B to be unsuitable as an employee it can end the employment at any time.

2. The terms of employment for Party B are according to the office regulations and other rules.

3. Party B acknowledges and agrees to the office regulations of Party A, other rules, and the following items before beginning employment.
    1. To not disclose to any third party, either directly or indirectly, trade secrets, technical secrets and any other secret information both during and after the employment period.
    2. To perform the job duties of maintaining order in the workplace by following the instructions of superiors and making efforts to continually improve technical skills and efficiency.
    3. To convey to the company the right to obtain any patents, utility models, or registered designs arising out of any inventive conception related to the employment.
    4. To consult with the company before any third party if inventive conceptions unrelated to the employment result in the right to obtain a patent, utility model, or registered design or result in a patent, utility model, or registered design, and the same is to be conveyed to a third party or permission to practice such rights is to be conveyed to a third party.
    5. To not privately engage in work or a side job, etc. on matters related to the scope of Party A's business.
    6. To raise no objection to the termination of employment if misrepresentations were made by Party B on the resume, employment application, or other documents or if false statements were made during the screening process.
    7. To conclude a post-employment confidentiality agreement in a manner prescribed by Party A upon the termination of employment.

4. After conclusion of this contract, Party A and Party B shall be bound by any revisions of the working conditions, office regulations, and other rules.

End

# Exhibit E

**HEWLETT PACKARD**

**INDEX10**
CAG

## Agreement Regarding Confidential Information and Proprietary Developments

Name: _David H. Thorson_
(Type or Print)

1. I am employed or desire to be employed by Hewlett-Packard Company (HP). I understand, however, that this Agreement is not a promise or a contract for employment by HP.

2. This Agreement concerns trade secrets, confidential business and technical information, and know-how not generally known to the public, (hereinafter "Confidential Information"), which is acquired or produced by me in connection with my employment by HP. Confidential Information may include, without limitation, information on HP organizations, staffing, finance, structure, information of employee performance, compensation of others, research and development, manufacturing and marketing, as well as information which HP receives from others under an obligation of confidentiality.  I agree:
    a. to use such information only in the performance of HP duties;
    b. to hold such information in confidence and trust; and
    c. to use all reasonable precautions to assure that such information is not disclosed to unauthorized persons or used in an unauthorized manner, both during and after my employment with HP.

3. This Agreement also concerns inventions and discoveries (whether or not patentable), designs, works of authorship, mask works, improvements, data, processes, computer programs and software (hereinafter called "Proprietary Developments") that are conceived or made by me alone or with others while I am employed by HP and that relate to the research and development or the business of HP, or that result from work performed by me for HP.  Such Proprietary Developments are the sole property of HP, and I agree:
    a. to disclose them promptly to HP;
    b. to assign them to HP; and
    c. to execute all documents and cooperate with HP in all necessary activities to obtain patent, copyright, mask works and/or trade secret protection in all countries, at HP's expense.

    In compliance with prevailing provisions of relevant state statutes,[1] this Agreement does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless (a) the invention relates (i) to the business of the employer, or (ii) to the employer's actual or demonstrably anticipated research or development, or (b) the invention results form any work performed by the employee for the employer.

4. I agree to honor any valid disclosure or use restrictions on Confidential Information known to me and received from any former employers or any other parties prior to my employment by HP, and I agree not to bring onto the premises of HP any such information in whatever physical form without prior written consent of such former employers or other parties.

5. The product of all work performed by me during and within the scope of my HP employment including, without limitation, any reports, documents, drawings, computer programs, devices and models, will be the property of HP; and HP will have the sole right to use, sell, license, publish or otherwise disseminate or transfer rights in such a work product.

6. I agree that any organizational information or staffing information learned by me in connection with my employment by HP is HP's Confidential Information, and I agree that I will not share such information with any recruiters or any other employers, either during or subsequent to my employment with HP; further, I agree that I will not use, or permit use of such, as a means to recruit other HP employees away from HP.

7. I will not remove any HP property from HP premises without HP's permission.

8. I agree not to disrupt, damage or interfere with the operation or business of HP by soliciting or recruiting its employees for myself or others, both during my employment at HP and for a period of two years following termination of my employment with HP.

9. Upon termination of my employment with HP, I will return all HP property to HP unless HP's written permission to keep it is obtained.

10. The provisions of this Agreement will be separately construed.  If any of them is held to be unenforceable, the remaining provisions will not be affected.

Signature
6/14/00
Date

[1]Including: California Labor Code, Section 2870; Illinois 765ILCS1060/1-3, "Employees Patent Act,"; Washington Rev. Code, Title 49 RCW; Labor Regulations, Chapter 49.44.140; Minnesota Statutes, 13A, Section 181.78; and North Carolina General Statutes, Article 10A, Chapter 66, Commerce and Business, Section 66-57.1.

9220-5360 3-99

# Exhibit F

# EMPLOYMENT AGREEMENT

In consideration of my employment with Compaq Computer Corporation, a Delaware corporation, having its headquarters at Houston, Texas (hereinafter referred to as "THE COMPANY"), the compensation paid to me as an employee, and other good and valuable consideration the receipt of which is hereby acknowledged, I __J. Brian Dennison__ agree as follows:

## I.    INTELLECTUAL PROPERTY RIGHTS

A.  I hereby assign, transfer, and convey to THE COMPANY my entire rights, title, and interest in any and all INTELLECTUAL PROPERTY which I have made or conceived or may make or conceive, whether as a sole inventor or originator or as a joint inventor or originator with another or others, whether made within or out of the usual working hours or upon the premises of THE COMPANY or elsewhere, during my employment with THE COMPANY.  I understand that INTELLECTUAL PROPERTY includes information of a technical and a business nature such as ideas, discoveries, inventions, improvements, trade secrets, know-how, machines, manufacturing processes, product designs, formulae, writings, and other works of authorship, theses, books, computer programs, lectures, illustrations, photographs, sales, profits, financial figures, marketing plans, business methods and the like, which relate in any manner to the actual or anticipated business of THE COMPANY, affiliates or subsidiaries thereof, or relate to its actual or anticipated areas of research and development.

B.  Either during or subsequent to my employment, upon the request and at the expense of THE COMPANY or its nominee, and for no remuneration in addition to that due me pursuant to my employment by THE COMPANY, but at no expense to me, I agree to execute, acknowledge, make and deliver to THE COMPANY or its attorneys any and all instruments which in the judgment of THE COMPANY or its attorneys may be necessary or desirable to vest in or secure for or maintain for the benefit of THE COMPANY adequate patent and other property rights in the United States and all foreign countries with respect to any INTELLECTUAL PROPERTY embraced within this agreement, including (1) United States and foreign patents and copyright applications, (2) any other applications for securing, protecting or registering any property rights embraced within this agreement, and (3) powers of attorney, assignments, oaths or affirmations, supplemental oaths and sworn statements; and further agree to assist THE COMPANY or its attorneys as required to draft said instruments, to obtain said rights, and to enforce said rights.

C.  I further agree in connection with paragraph A hereof to disclose promptly to THE COMPANY or its attorneys, any and all ideas, designs, inventions, improvements, discoveries, developments, when conceived or made, in whole or in part, by me and to make and maintain adequate and current records thereof.

D.  Any idea, designs, inventions, improvements, discoveries, and developments disclosed by me within one (1) year following termination of my employment shall be deemed to be owned by THE COMPANY under the terms of paragraph A and B hereof, unless proved to have been conceived after such termination.

## II.   NON-DISCLOSURE OF CONFIDENTIAL MATTERS

A.   I agree not to make any unauthorized use, publication, or public disclosure, during or subsequent to my employment by THE COMPANY, of any INTELLECTUAL PROPERTY of a confidential or trade secret nature, generated or acquired by me during the course of my employment, except to the extent that the disclosure of such INTELLECTUAL PROPERTY information is necessary to fulfill my responsibilities as an employee of THE COMPANY. I understand that confidential matters and trade secrets include information not generally known by or available to the public about or belonging to THE COMPANY, or belonging to other companies to whom THE COMPANY may have an obligation to maintain information in confidence, and that authorization for public disclosure may only be obtained through THE COMPANY'S written consent.

B.   I further agree not to disclose to THE COMPANY, nor induce THE COMPANY to use, any confidential or trade secret information or material belonging to others.

## III.   COMPETITIVE ACTIVITIES

As an independent covenant, I further agree to refrain during my employment by THE COMPANY, and in the event of the termination of my employment for any reason, for 1 year(s) thereafter, without written permission from THE COMPANY, from becoming interested in any way, in the business of manufacturing, designing, programming, servicing, repairing, selling, leasing or renting any products, articles, parts, supplies, accessories or services competitive with those sold and furnished by THE COMPANY, as an employee, consultant, partner, proprietor or in any other capacity, except as a shareholder owning less than five percent of the share of a corporation whose shares are traded on a stock exchange or in the over-the counter market by a member of the National Association of Securities Dealers.

## IV.   TERMINATION

Upon the termination of my employment, I will promptly turn over to THE COMPANY all models, prototypes, notes, memorandums, notebooks, drawings, records, documents, and the like in my possession or under my control, whether prepared by me or others, relating to INTELLECTUAL PROPERTY, and any work done for THE COMPANY related thereto, it being acknowledged that all such items are the sole property of THE COMPANY.

## V.   MISCELLANEOUS PROVISIONS

A.   Set forth below in this paragraph is a list of all inventions, discoveries, improvements and developments patented or unpatented, copyrighted or uncopyrighted, if any, which I made before entering THE COMPANY'S employ, and which are excluded from the operation of this agreement, and I agree that said list is complete. _____None_____

(Insert items applicable or "none" if there are none.  If space is insufficient, attach a list labeled Exhibit A and insert "See Exhibit A" above.)

## V.  MISCELLANEOUS PROVISIONS, CONTINUED

B.  The law of the State of Texas shall govern this agreement.

C.  I agree that exclusive jurisdiction with respect to any legal proceeding regarding any subject matter contained in this agreement shall rest in the State of Texas.

D.  This agreement supersedes any agreement or understanding previously existing between me and THE COMPANY relating to the subject matters contained herein.

E.  I further agree that this agreement shall be binding upon me irrespective of the duration of my employment by THE COMPANY, the reasons for the cessation of my employment by THE COMPANY, or the amount of my wages and/or salary.

F.  This instrument is the whole agreement, and no modification or variation shall be deemed valid, unless provided for in a subsequent written agreement signed by THE COMPANY.

G.  This agreement shall be binding upon my heirs, executors, administrators, and legal representatives.

H.  Should any part or provision of this agreement be held to be unenforceable, the validity of the remaining parts or provisions shall not be affected by such holding.

I.  I represent and warrant to THE COMPANY that I am not now under any obligation to any person, firm or corporation, or have no other interest which is inconsistent or in conflict with this agreement, or which would prevent, limit, or impair in any way, the performance by me of any of the covenants hereunder or my duties in my employment by THE COMPANY.

ACCEPTED BY:

_____
(SIGNATURE)

_____
(TITLE)

_____
(DATE)

_____
(EMPLOYEE SIGNATURE)

_____
8/28/90
(DATE)
9/24/90 (START DATE)

lv/3-16-89

Page 3 of 3

# Exhibit G

Oct 24 05 02:31p     Alicia Sylvestre       (770) 844-9174        p.2
10/24/05   14:28 FAX 17812518701      TACWORLDWIDE COMPANIES         ⊠002

# Chimes

## Compliance Affidavit

Chimes Rep#

| | |
|---|---|
| Assigned HP Site: BAY AREA | HP Manager: KARL KNOR |
| AC Name: POOJITHA DESENA | Building Assigned: |
| Vendor Supplier: TAC Worldwide Companies | Date Assignment Signed: 10/7/03 |

| Mandatory Conditions of Assignment<br>Verification (check completed items and<br>provide completion dates)<br>_X_ Date of Safety Training Verification<br>Completion: 5/11/04<br>_X_ Date of Drug Test Completion: 10/7/03<br>_X_ Date of Background Check Completion:<br>10/7/03<br>___ Date Chimes/HP Orientation Manual<br>Received: 5/11/04<br>_X_ Non-Disclosure Agreement 5/11/04 | Mandatory Safety Training Received<br>_X_ New Employee Orientation<br>_X_ Emergency Procedures<br>_X_ Evacuation<br>_X_ Ergonomics- Office/Assembly |
|---|---|
| Job Title Specific Safety Training Received<br>___ Electrical- Effected Worker<br>___ Electrical- Power Tools<br>___ Evacuation- Safety<br>___ Ergonomics- Design<br>___ Ergonomics- Manual Handling/Back Care<br>___ Ergonomics- Manufacturing/Assembly<br>___ Forklift/Industrial Trucks<br>___ Hazard Communication Program<br>___ Hazardous Materials<br>___ Ladder Safety/Fall Protection<br>___ Lockout and Tagout<br>___ Machine Safety and Guarding<br>___ Personal Protective Equipment<br>___ Powered Industrial | Hiring Manager Requested Safety Training<br>(Please fill in name of requested training and<br>check as required.)<br>___<br>___<br>___<br>___<br>___<br>___<br>___<br>___<br>___<br>___ |
| I POOJITHA DESENA , an employee of TAC or Supplier , hereby verify that I have completed<br>the above required assignment conditions prior to the start of my assignment at Hewlett Packard.<br>Additionally, I am not a holder of an H1-B or F-1 Visa and legally able to work in the United States.<br>Signed:<br>Date:  11 MAY 2004 | |
| For Chimes On-Site Use Only:<br>___ Date of AC Badging Process Completed:<br>___ AC Escorted to Hiring Manager<br>___ Date of Site Specific Orientation Provided:<br>___ Additional Skill Verification Requested by Hiring Manager Completed<br>    (Please list verifications provided): | |

- 1 -

SENT BY: ;                   +12538898271;          MAY-20-04  8:34;          PAGE 2/4

Oct 24 05 02:31p    Alicia Sylvestre        (770) 844-9174          p.3
10/24/05  14:25 FAX 170)7518701        TATWORLDWIDE COMPANIES            @001

## NON-DISCLOSURE AGREEMENT

The undersigned is aware that Hewlett-Packard ("Customer") and Chimes, Inc. ("Chimes") have entered into an Agreement for Centralized Vendor Management Services ("Agreement") and I fully understand that it imposes certain obligations on Chimes and its permitted subcontractors, some of which are specifically set forth below.  I further understand that as part of its obligations under the Agreement, Chimes is required to obtain this written agreement from certain personnel, including myself, to further ensure understanding and compliance with these obligations.

In consideration of my future assignment and/or responsibilities in connection with Chimes' performance under the Agreement, I hereby acknowledge, represent and confirm to Chimes and Customer as follows: (a) I have read the provisions of this Non-Disclosure Agreement, understand each of them, agree to them, and know of no agreements, obligations, or restrictions which prevent or prohibit me from complying with them; (b) I will receive and maintain all Customer Information, perform services, and conduct myself, in all respects during the term of the Agreement and any Assignment Orders and for the requisite periods thereafter, in a manner consistent with these obligations of non-disclosure; and (c) I agree not to, directly or indirectly, engage in or assist others to engage in, any activity or conduct which violates the provisions of this Non-Disclosure Agreement.

I agree that during the course of this engagement, information that is non-public or proprietary may be disclosed by Customer, to Participating Vendor, including trade secrets, methodologies, supplier lists, data, including cost and price data, software, computer and telecommunications systems, records, technical processes and formulas, product designs, sales, unpublished financial information, product and business plans, usage rates, projections, marketing data and memoranda, papers, letters, e-mail, notes, plans, documentation, records and all copies thereof relating to past, existing, or planned business or technology of Customer or of Customer clients or customers ("Confidential Information").   Confidential Information of any Customer Entity and all Work Products hereunder, software in source code or object code, deliverables, processes, specifications, or data developed by any Consultant in connection with this Agreement shall be the Confidential Information of Customer.

I shall hold all Customer's Confidential Information in trust and confidence for Customer, its subsidiaries, and affiliates.  Except as may be authorized by Customer in writing, Participating Vendor shall not disclose to any person, firm, or enterprise, or use for its own benefit, any such Confidential Information, and even when so authorized by Customer, Participating Vendor shall limit access and disclosure to Participating Vendor's personnel and Consultants on a "need to know" basis only.

I acknowledge that Services performed for Customer may relate to past, present, or future strategies, plans, business activities, methods, processes and/or information that afford Customer certain competitive or strategic advantages.

I understand that if I threaten to or actually breach or fail to observe any of the obligations set forth in this Non-Disclosure Agreement, Customer will be subject to irreparable harm which will not be adequately satisfied by damages.

In addition, I agree and represent that I am not Customer's agent or employee for federal, state, and local tax purposes or any other purposes whatsoever, and am not entitled to any Customer employee benefits

BY:

Printed Name:   POOJITHA  PREENA

Date:   11 MAY  2004

Witness:

Title:   Business Development VP

SENT BY: ;

p.3                                                    Oct 24 05 01:43p

# Exhibit H





Standards of
Business Conduct

# HP Standards of Business Conduct

## Conduct Involving HP

### 1.1 CONFLICTS OF INTEREST

| | | |
|---|---|---|
| 1.1.1 | General Policy | 2 |
| 1.1.2 | Outside Employment and Other Activities | 2 |
| 1.1.3 | Volunteer Activities | 3 |
| 1.1.4 | Personal Benefit from HP Business | 4 |
| 1.1.5 | Business Gifts and Entertainment for HP Employees | 4 |
| 1.1.6 | Outside Directorships | 5 |
| 1.1.7 | Investments in Other Businesses | 6 |
| 1.1.8 | Disclosing Potential Conflicts | 6 |

### 1.2 HANDLING COMPANY INFORMATION

| | | |
|---|---|---|
| 1.2.1 | General Policy | 7 |
| 1.2.2 | Basic Rules for Handling HP Information | 7 |
| 1.2.3 | Sensitive Information Guidelines | 7 |
| 1.2.4 | Disclosing Sensitive Information | 9 |
| 1.2.5 | Receiving Sensitive Information | 9 |
| 1.2.6 | Handling News about HP | 10 |
| 1.2.7 | Profiting from Inside Information | 10 |
| 1.2.8 | Records and Information Management | 11 |
| 1.2.9 | Lawsuits and Disputes | 11 |

### 1.3 HANDLING COMPANY ASSETS

| | | |
|---|---|---|
| 1.3.1 | General Policy | 12 |
| 1.3.2 | Business and Accounting Practices | 12 |
| 1.3.3 | Political Contributions | 12 |
| 1.3.4 | Business Gifts and Entertainment from HP | 13 |
| 1.3.5 | Personal Use of HP Resources | 14 |
| 1.3.6 | Copyright Compliance | 15 |

# Conduct Involving Competitors, Resellers, and Customers

**2.1  DEALING WITH COMPETITORS**

| 2.1.1 | General Policy | 16 |
|---|---|---|
| 2.1.2 | Contacts with Competitors | 16 |
| 2.1.3 | Trade Associations | 17 |
| 2.1.4 | Obtaining Competitive Information | 17 |

**2.2  DEALING WITH RESELLERS**

| 2.2.1 | General Policy | 18 |
|---|---|---|
| 2.2.2 | Resale Price Maintenance | 18 |
| 2.2.3 | Managing Resellers | 18 |
| 2.2.4 | Price Discrimination | 18 |

**2.3  DEALING WITH CUSTOMERS**

| 2.3.1 | General Policy | 19 |
|---|---|---|
| 2.3.2 | Advertising | 19 |
| 2.3.3 | Tying | 19 |
| 2.3.4 | Government Procurement | 20 |

# Conduct Involving Suppliers

| 3.1 | General Policy | 21 |
|---|---|---|
| 3.2 | Choosing Suppliers | 21 |
| 3.3 | Formal Bids | 21 |
| 3.4 | Handling Information from Suppliers | 22 |
| 3.5 | Supplier Prices | 22 |
| 3.6 | Customer References | 22 |

# Relationship to Other Policies 23

# HP Standards of Business Conduct

We conduct our business with uncompromising integrity.

We expect HP people to be open and honest in their dealings to earn the trust and loyalty of others. People at every level are expected to adhere to the highest standards of business ethics and must understand that anything less is totally unacceptable. As a practical matter, ethical conduct cannot be assured by written HP policies and codes; it must be an integral part of the organization, a deeply ingrained tradition that is passed from one generation of employees to another.

*From* The HP Way: Organizational Values

# Conduct Involving HP

### 1.1   CONFLICTS OF INTEREST

### 1.1.1   General Policy

Although Hewlett-Packard employees are generally free to engage in personal business and financial transactions and other activities outside HP, this freedom is not unlimited. As long as you remain an HP employee, you must avoid situations where your loyalties may be divided between HP's interests and your own. HP expects you to avoid even the appearance of a conflict of interest.

You can avoid most conflicts of interest by following the rules described below. However, these rules do not cover all potential conflicts - all situations that may result, or appear to result, in divided loyalties. You are responsible for bringing any doubtful situation to the attention of your managers so they can provide appropriate guidance.

### 1.1.2   Outside Employment and Other Activities

#### *May I work for another company or have my own business?*

HP policy does not prohibit all outside employment, but does forbid any outside work that could lead to divided loyalties. Could the activity give you an improper incentive to make decisions or take actions that would be unfair to HP? Could it present the appearance of improper influence? A job with an HP competitor can tempt an HP employee to misuse our company's confidential information. A job with an HP supplier can provide an incentive for favoritism toward the supplier. A job with an HP customer can prompt favoritism toward the customer or provide an incentive to misuse HP resources for the customer's benefit.

The following examples illustrate outside work that is prohibited by HP because of these considerations.

- You may not work for a competitor of any HP division or operation. For example, you may not work for a corporation that makes computers or peripherals, even if your division makes unrelated products.

- You may not work for an HP supplier without written approval from your entity's general manager. For example, without your GM's approval, you may not work for a firm that sells office supplies to HP, even if your HP assignment does not include buying office supplies.

- You may not work for an HP customer if you deal with that customer for HP, or if others in your HP entity or office deal with the customer, without written approval from your entity's general manager. You may work for an HP customer without your GM's approval if nothing in your work for the customer relates to HP, nothing in your HP job relates to the customer, and no one else in your HP entity or office deals with the customer on HP's behalf. For instance, you may take a second job as a bookkeeper for a company that uses HP computers and printers, provided no one in your HP office deals with that company, but you may not take a job that involves maintaining HP equipment for the same company.

- You may work for an HP reseller without approval from your entity's general manager only if the position does not relate to any of the following: (1) your HP job, (2) your HP entity or office, (3) the reseller's dealings with HP or HP products or services, or (4) the reseller's involvement with products or services that compete with HP products or services. Any other work for an HP reseller requires your GM's written approval. For example, an employee whose HP assignment doesn't relate to retail stores could take a second job selling kitchen equipment for a store that sells HP products, but could not, without a GM's approval, take a job selling either HP products or competing products for the same store.

- You may not have more than one HP employment status at a time. As an example, you may not be an employee for one HP division and a consultant for another.

- You may not sell HP products or services, or products or services similar to HP's. For example, you may not provide engineering support for HP products on your own time.

- You may not engage in activities that support or promote a competitor's products. For instance, you may not write a commercial user's guide for a competitor's instruments.

- You may not accept a position with another company if the time demands of the second position interfere with your HP job. For example, a second job that requires receiving phone calls during your work hours at HP would not be acceptable.

In all these situations, the focus is whether the outside activity presents a potential conflict of interest, not whether your role in the activity is labeled "employee," "consultant," "contractor," "investor" or "volunteer." For instance, consulting for an HP competitor presents the same problems as employment by the competitor, and owning a firm that sells products to HP presents the same problems as employment by that firm.

### 1.1.3   Volunteer Activities

#### *Are there limits on my ability to serve as a volunteer?*

Although HP strongly supports volunteer service with charitable, professional and community organizations, there are many situations in which volunteer activity presents the same potential for divided loyalties as paying jobs and business involvement. Your volunteer service must generally be performed on your own time and at your own risk, but the fact that you are not compensated for that service does not mean conflicts will not arise. Prohibited conflicts of interest in volunteer work include the following:

- You may not participate in HP decisions regarding a charity or other organization where you volunteer your time, and you may not advocate the charity's or organization's interests within HP without disclosing your connection to it.

- You may not allow a charity or volunteer organization to use HP's name or assets without appropriate management approval.

- You may not solicit others on HP property or during HP working hours on behalf of a charity or volunteer organization, except as part of an annual charity drive that has appropriate management approval.

Your volunteer service to a charity that is also an HP supplier or customer may present some of the same issues as paid employment. For instance, if the charity is an HP supplier, you must remove yourself from any HP decisions to select, retain or evaluate the charity in its relationship with our company.

**Conduct Involving HP**

### 1.1.4   Personal Benefit from HP Business

#### *May I accept anything for myself in connection with my work for HP?*

You may not receive any personal profit or advantage other than your compensation from HP in connection with any transaction involving HP. For example, an HP sales representative may not receive commissions from a software company in return for promoting its products. As another example, if you have advance knowledge that our company may acquire property in a particular location to build a plant, you cannot purchase the property or an adjoining property, and you cannot advise others to do so.

You may participate in published frequent traveler programs, except those offering cash refunds. You may not accept other kinds of free travel. You may not participate in frequent purchaser programs outside the travel industry. For example, you may not accept merchandise from an office supply vendor based on the volume of our company's purchases from that vendor.

#### *May I arrange an HP business deal with my family, or with a friend?*

You must disclose all situations where you or your HP entity may be conducting HP business with members of your family. Once you disclose the situation, your entity's general manager may give written permission for HP to do business with your family, but you will be required to remove yourself from HP's decisions about retaining, supervising or evaluating their services. The GM may impose other safeguards as well, such as a requirement that HP consider proposals from competing businesses.

Most of the same principles apply if you or your HP entity may be conducting HP business with friends or others with whom you have a close personal relationship. For example, if an HP supplier is your neighbor and a close friend, your decisions about our company's business with your neighbor may create an appearance of favoritism and therefore a conflict of interest even if you receive no gifts or expensive entertainment from your neighbor. You should address the problem by disclosing the situation and limiting your role in HP's decisions.

### 1.1.5   Business Gifts and Entertainment for HP Employees

#### *Companies that I deal with for HP often distribute gifts and incentives to their customers. What may I accept?*

Decisions made on behalf of our company must be free from undue influence, or even the appearance of undue influence, from suppliers, customers, resellers and competitors. You may generally accept inexpensive promotional items and normal business meals and entertainment from other companies. With those limited exceptions, you and your family must not accept any gift, payment, loan or favor, or anything else of value, in any context that relates to HP business or potential business. (Some HP entities and departments have more restrictive rules; for example, some departments forbid their employees to accept promotional items.)

You must exercise care in accepting business meals and entertainment. Such activities should be infrequent, consistent with accepted business practice, and for the express purpose of furthering a business relationship. For example, it's inappropriate to accept tickets for an entertainment event from a supplier unless a representative of the supplier is also present at the event.

You may not accept payment of travel expenses from an HP supplier, customer or reseller without written approval from your entity's general manager.

In rare circumstances, local custom outside the United States may call for an exchange of gifts having more than nominal value as part of a business relationship. In these situations, with written approval from your entity's general manager, you may accept such a gift on behalf of HP, but the gift should be turned over to HP for appropriate disposition, such as use by your department or donation to charity.

If you are unsure whether you can accept any proposed gratuity, business meal or entertainment, you should disclose the situation, and your entity's general manager will determine its acceptability. Some HP entities set maximum values for gifts and meals that can be accepted without their GM's review.

**1.1.6    Outside Directorships**

### *What if I'm asked to be a director for another organization?*

You may not accept a position as a member of the board of directors of any HP competitor. You may not be a director of a company or organization that supports or promotes a competitor's products or services without approval from a member of HP's Executive Committee. You may not be a director of an HP supplier, customer or reseller without approval from a member of HP's Executive Committee, or, in the case of a non-profit supplier, customer or reseller, written approval from your entity's general manager.

If you are serving as a director of a company or other organization, and you encounter any situation where your role as a director may be in conflict with HP's interests, you must either withdraw from that situation or resign as a director.

You may not receive separate compensation, such as stock options, for service on the board of directors of a company if you serve at HP's request or in connection with an HP equity investment in the company.

### *May I purchase "founders' stock" in an HP supplier, customer or reseller?*

"Founders' stock" is sometimes offered to select individuals at a price lower than that offered to the general public. You may not purchase such stock in an HP supplier, customer or reseller with which you deal or your HP entity deals, because the bargain price amounts to a personal benefit from HP business activity.

**Conduct Involving HP**

### 1.1.7   Investments in Other Businesses

#### *What personal investments are not acceptable?*

You may not have a personal or family financial interest in any HP supplier, customer, reseller or competitor that might cause divided loyalty, or the appearance of divided loyalty. Whether there may be divided loyalty depends on many factors, including your ability to influence HP decisions that affect your personal interest, the size of the investment relative to your other resources, and the nature of the relationship between our company and the other business.

Owning 100 shares of a publicly traded company is unlikely to cause divided loyalties. However, investing a substantial portion of your savings in an HP supplier or reseller is likely to present a conflict of interest, particularly if you can in any way influence the business relationship between HP and the supplier or reseller.

### 1.1.8   Disclosing Potential Conflicts

#### *When should I report an outside activity or investment to HP management?*

You need not report every outside activity or investment to HP. However, you must promptly disclose in writing to your entity's general manager any situation that could present a conflict of interest. You must therefore disclose any outside work for an HP competitor, customer, reseller or supplier, or any other involvement that could cause divided loyalties.

In situations that require management approval, the responsible manager will review the matter and communicate our company's position in writing. The manager may indicate either that (1) HP has no present objection to the relationship, although the situation is subject to future review if there is any change in circumstances either for you or for HP, or (2) there are specific steps you must take to resolve any potential conflict to HP's satisfaction. You will have a continuing obligation to disclose any change in circumstances that could affect HP's interests. Copies of your disclosure and HP's response will be kept in your personnel file.



**1.2    HANDLING COMPANY INFORMATION**

## 1.2.1   General Policy

Hewlett-Packard business and technical information is company property. It may be disclosed only by the HP employees who are designated as responsible for it, and only when those designated employees or their managers determine there are good business reasons for sharing it.

Sensitive information should be disclosed or accepted only under the protection of a written Confidential Disclosure Agreement, with an appropriate written record that documents all aspects of the disclosure or acceptance. Ill-considered disclosures can weaken our company's competitive position, jeopardize R&D, and squander our investments in the processes and resources we have developed for conducting our business.

## 1.2.2   Basic Rules for Handling HP Information

### *What rules apply to all HP information?*

Everyday information within HP, whether specially labeled or not, is HP property that must be used only for HP business purposes. Restrictions on the use of HP information apply both while you work for our company and after you leave. In other words, you may not use HP information in a later job.

Sometimes unknown people from outside HP request information regarding HP's activities. Inquiries from government, the media, securities analysts, suppliers, customers and resellers should be referred to the HP people designated to communicate with them. You should not provide anyone outside HP with information that you are not specifically authorized to disseminate in your HP assignment.

Sensitive information must be protected against both unauthorized external disclosure and unauthorized disclosure within HP. In generating information, you should label it to indicate the degree of care that must be applied in storing and distributing it. In using information, you should apply the right level of protection in filing it and passing it along to others. Under no circumstances should you disclose it outside HP without prior approval from the responsible department. You should be equally careful when releasing prototypes or models.

## 1.2.3   Sensitive Information Guidelines

### *What should I do to protect HP's sensitive information?*

You should label sensitive information in accordance with HP guidelines to indicate the level of care to be exercised in handling it and how widely it can be distributed. These guidelines establish three standard labels, "HP Private," "HP Confidential" and "HP Restricted." You should not remove a label from a document without consulting the others within HP who have a stake in the information, although you may apply a more restrictive label if you feel that is appropriate. Unlabeled information should be scrutinized and presumed to be sensitive unless a good reason exists for believing otherwise.

**"HP Private"** is used for information that requires the highest level of protection because premature disclosure could harm HP's competitive position or could prompt improper trading in HP securities. Generally, this information is one of the following:

• Unpublished consolidated financial plans or results, including revenue or order data, such as the Management Financial Summary (the "Blue Book");

• Unpublished financial plans or results for a significant part of HP's business;

• Competitive information for a significant part of HP's business, including strategic plans, development plans, cost structures or unit volumes for products or services that may account for more than 1% of HP revenues, such as a Business Strategic Summary ("BSS") for an activity that represents more than 1% of revenues;

• Documents relating to significant proposed acquisitions and divestitures.

HP Private information may be given only to HP employees who have jobs that require it. The entity general manager or other functional owner of HP Private information is responsible for compliance with strict IT access and security standards if the information is posted on HP's intranet. The GM or functional owner may impose additional security requirements for handling the information in other forms - for example, use of numbered copies for greater control of hardcopy distribution.

HP Private information is rarely shared outside HP, and must never be shared without a Confidential Disclosure Agreement.

**"HP Confidential"** is used for information intended only for a limited audience within HP. This includes most information relating to HP projects, technical data, R&D, negotiated prices and most product or plan data.

HP Confidential information should be distributed to its intended audience using good business judgment. It must not be shared outside HP unless a Confidential Disclosure Agreement is in place. It can be posted on HP's intranet only with password protection or similarly stringent measures to ensure authenticated access.

**"HP Restricted"** is used for information intended for widespread distribution within HP and to anyone having site access or access to HP's computer systems. This includes most organization charts, telephone lists, cubicle maps and information formerly classified as HP Proprietary or HP Internal Use Only.

HP Restricted information must not be shared outside HP unless a Confidential Disclosure Agreement is in place. It can be posted on HP's intranet without additional restrictions, but can be posted to the external internet only with limited access.

Within these broad categories, several types of specialized information present additional issues:

• **Material inside information,** usually labeled HP Private, is information that would influence a reasonable person to buy or sell HP stock (see Section 1.2.7: Profiting From Inside Information).

• **Attorney-client privilege** applies to communications to HP attorneys for the purpose of obtaining their legal advice and communications from HP attorneys applying their advice to HP activities. This information is typically labeled HP Private or HP Confidential. It should not be copied or distributed except under the direction of an HP attorney. It should be given only to the narrowest possible set of HP people who have a need for it.

• **Personal information** about individuals, whether specially labeled or not, must be treated with due respect for privacy. In Europe, a European Union directive and related local laws govern HP's use of personal data, including information about HP employees and individuals outside the company. You must comply with these rules if your activities at HP involve the collection, storage, use or transfer of data relating to identifiable individuals.

### 1.2.4   Disclosing Sensitive Information

*What precautions should HP take when it discloses information on a confidential basis to customers, suppliers and others outside our company?*

When HP has made a management decision that business needs require us to disclose sensitive information to a customer, supplier or anyone else outside our company, an appropriate written agreement should be put in place to ensure the information will be handled in accordance with our expectations.

In some instances, a standard HP contract, such as HP's purchasing agreements or agreements for professional services, will specifically address the outside party's confidentiality obligations as well as other business issues. In other situations, it is necessary to use the separate, standard Confidential Disclosure Agreement ("CDA") published by HP's Legal Department. If you are in doubt about whether to use a separate, standard HP CDA in addition to another standard HP contract to cover confidentiality obligations, you should consult HP's legal staff.

When customers, suppliers and other outside parties wish to use their own form of agreement in place of the standard HP CDA, you should consult HP's legal staff before accepting a nonstandard form.

In implementing a disclosure by HP under an appropriate confidentiality agreement, you should maintain a complete file, including a record of what was disclosed, to whom it was disclosed, and how it was disclosed, with evidence that HP properly confirmed the confidential nature of the information at the time of disclosure.

### 1.2.5   Receiving Sensitive Information

*May I accept information that someone outside HP wishes to submit in confidence?*

Although HP sometimes has a business need to receive information from a company or individual outside HP, you should be cautious when anyone wishes to share information based on an expectation that HP will hold it in confidence. Casual acceptance of confidential information creates a risk that our company will be accused of misusing it. It's particularly risky for us to accept sensitive information from potential competitors, because whatever we receive may overlap ideas we develop on our own and wish to use without restrictions in HP's activities.

It is HP's policy not to examine unsolicited suggestions that the submitter may consider confidential, such as unsolicited ideas for future products. This policy is intended to prevent HP's own R&D and other business activities from becoming encumbered by unintended obligations to outsiders. Any recipient of an unsolicited suggestion should immediately contact either the HP Legal Department's Outside Suggestion Coordinator in Palo Alto or the HP intellectual property attorneys who support the country in which HP receives the suggestion.

You should accept information that will be treated as confidential (i) only when HP has made a management decision that accepting it is necessary, and (ii) only after a written agreement is in place to identify the information and define and limit HP's obligations in dealing with it. The agreement should be either HP's standard Confidential Disclosure Agreement or another written agreement that has been reviewed by HP's Legal Department. You should handle the information in accordance with the agreement, and use it only for the purposes permitted by the agreement.

The best practice in receiving sensitive information, just as in disclosing it, is to maintain a complete file that documents HP's performance of its obligations.

**Conduct Involving HP**

### 1.2.6   Handling News about HP

## *How does HP keep the public informed of developments?*

It is HP's policy that our company's designated representatives will make the public aware of news that may be significant to financial markets, such as earnings, acquisitions and major organizational changes, at the earliest appropriate time. The timing of these announcements must comply with legal requirements, and depends in part on the need to maintain confidentiality before decisions are made and to avoid providing information helpful to competitors.

News that can be expected to have an impact on the market for HP stock, including forward-looking information such as projections of orders, net revenue or earnings, may be released only through the Corporate Treasurer's office or Corporate Communications following HP's guidelines and United States securities laws. Other contacts with news organizations should be handled through either Corporate Communications or your local HP communications specialist.

### 1.2.7   Profiting from Inside Information

## *How does my knowledge of information about HP affect my dealings in HP stock?*

If you have information about HP that is both material and non-public, called "material inside information," you cannot legally trade in HP stock, or make recommendations to others about trading in it, until a reasonable time, usually 24 hours, after HP issues a press release disclosing the information.

Information is "material" if it would influence a reasonable person to buy or sell stock. Examples include undisclosed data reflecting orders, sales, earnings or profitability, or trends in these figures; impending announcements of major new products; major HP acquisitions, equity investments or divestitures; and important developments in projects, alliances or litigation. The fact that one of HP's largest product groups is 15% over or under targets is "material." The fact that HP may sell $20 million rather than $15 million worth of a given product in the current fiscal year isn't "material" in this context, even though it's sensitive information that should be protected against disclosure.

Information is "non-public" if it hasn't been the subject of an HP press release.

Trading in HP stock includes buying or selling HP shares in the open market, buying or selling exchange-traded HP options, selling shares that were purchased under an HP employee stock option, and transferring funds to or from an HP stock fund account in TAXCAP (HP's 401(k) plan for the U.S.). It does not include regular, continuing purchases through HP's employee stock purchase plan or purchases, without sale, of shares through exercise of an HP employee stock option.

While there is no "safe harbor" under these rules, it's relatively safe for most HP employees to trade in the five- to six-week period that starts 24 hours after our company announces quarterly or annual results and ends at the close of the month after the announcement. For those with access to interim data about consolidated results, the trading window will be shorter.

Partial release of material information does not clear insiders to trade if other material information remains undisclosed. For example, if a major product announcement is set for the week after a quarterly earnings report, employees who know about the product should wait to trade until 24 hours after the product launch rather than 24 hours after the earnings report.

If you violate insider trading laws, both you and HP may be subject to severe criminal penalties. U.S. insider trading laws apply to all HP employees at any level, not merely to officers or managers. They apply to HP employees outside the U.S. who trade within the U.S. They apply even to relatively small transactions.

Similar laws in other countries may apply to trading by HP employees who are located in those countries, or to trades in exchanges that are located there. Most of Europe is covered by insider trading restrictions under an EU directive and parallel national legislation.

If you are considering a stock transaction, and you believe you may have material inside information, you should consult HP's Legal Department or the Corporate Treasurer.

### *Can my knowledge about another company make me an insider for that company?*

If you learn material inside information about another company, you may be considered an insider for that company, putting you under the same trading restrictions with regard to that company's securities. As an example, knowing non-public information about an HP transaction with a supplier that could have a material effect on the supplier's financial performance could make you an insider with regard to the supplier's stock.

## 1.2.8  Records and Information Management

### *How long should HP retain its records, either on paper or in electronic files?*

HP has a formal, company-wide policy, called the General Retention Schedule, covering the way you should retain, protect and dispose of company records. The general rule is that you should not keep ordinary correspondence and department documents, including electronic messages, more than one year after the last active date in a record or file. The longer retention periods in the General Retention Schedule are exceptions to this general rule.

You are expected to treat company records according to established retention schedules and not to keep files longer than required. It is just as important to dispose of routine materials promptly as to keep specialized materials for the longer periods prescribed for them.

## 1.2.9  Lawsuits and Disputes

### *How do I handle company information that may relate to a lawsuit?*

In the U.S., documents that initiate lawsuits and subpoenas involving HP should be sent immediately to the Litigation Section of HP's Legal Department in Palo Alto. Outside the U.S., they should be sent to the HP attorneys who support the geographic area where HP receives them.

Records relevant to a lawsuit are an exception to normal retention and disposition procedures, and must not be destroyed. If you are involved in a lawsuit or other legal dispute involving our company, you must avoid discussing it with either outsiders or other HP employees without the prior approval of HP's Legal Department.

**Conduct Involving HP**

**1.3    HANDLING COMPANY ASSETS**

### 1.3.1   General Policy

Every employee must take care to safeguard Hewlett-Packard assets. This includes protecting them from unauthorized use. Use of HP assets for any unlawful or improper purpose is strictly prohibited.

### 1.3.2   Business and Accounting Practices

#### *What accounting practices must I follow?*

You must comply with generally accepted accounting principles for the United States and for every country in which you conduct HP business, and you must execute all transactions involving HP in accordance with HP policies and procedures.

- You may not establish any undisclosed or unrecorded HP fund or asset for any purpose.

- You may not make any false or misleading entries in HP's books or records for any reason.

- You may not make any payment regardless of form on HP's behalf without adequate supporting documentation or for any purpose other than as described in the documents.

- You must be properly authorized in order to have access to HP funds or assets.

These standards are intended not only to protect HP against fraud and corruption within the company, but also to ensure that HP resources are never used for corrupt purposes outside the company.

#### *What special rules apply to payments to distributors?*

Commission or fee arrangements must be made only under written agreements with bona fide commercial distributors, sales representatives, agents or consultants. Any commission or fee for assistance in securing orders must be reasonable and consistent with local laws and normal practice for the industry, the products involved and the services to be rendered.

The Foreign Corrupt Practices Act in the U.S. and local laws in other countries prohibit payments and business relationships with government officials in any country that could be construed as bribes or attempts to influence government behavior. You should not enter into fee arrangements with any firm in which a government official or employee has an interest unless permitted by law and with the prior written approval of HP's General Counsel. Payments must not be made in cash.

### 1.3.3   Political Contributions

#### *Can HP funds or resources be used for political campaigns?*

HP may not use its corporate funds or assets for U.S. federal political contributions. An independent entity, the HP Committee for an Effective Congress, solicits individual contributions from HP managers to support selected candidates in federal campaigns. In the U.S., HP makes contributions to state candidates and state and local ballot measures only upon approval of the HP State Contributions Committee. No contributions are made to local candidates.

HP funds or assets may not be used for political contributions outside the U.S., even where permitted by local law, without clearance from HP's Legal Department and prior written approval from a member of HP's Executive Committee.

HP's programs and contributions in these areas are managed by HP's Director of Government Affairs.

These restrictions are not meant to discourage you from making personal contributions to political candidates of your choice. However, HP will not reimburse you for personal contributions.

### 1.3.4   Business Gifts and Entertainment from HP

#### *May I present a business gift to someone who represents an HP customer, reseller or supplier?*

HP strictly forbids paying commissions or compensation to employees or other representatives of customers, including resellers; to employees or representatives of suppliers; or to family members or associates of these individuals. An exception is made for openly announced incentive programs approved by an HP vice president or the VP's designate. For example, an HP vice president may approve an openly announced, HP-sponsored sales contest for employees of HP resellers.

Business entertainment, favors and promotional items may be provided on HP's behalf to employees and other representatives of customers and suppliers only if:

• They are consistent with generally accepted ethical standards and business practice;

• They cannot be construed as bribes or kickbacks as a result of how much they cost, how often they are given, or other related circumstances;

• They do not violate any applicable law, regulation or policy, including any policy adopted by the customer or supplier; and

• Public disclosure of the facts will not embarrass HP.

Among the factors that are important in determining the propriety of business entertainment offered by our company are:

• Cost, frequency and timing;

• Whether the setting is conducive to building a business relationship; and

• Whether the entertainment is fully visible to management in the organization whose employee or representative receives it.

For example, business meals that could be appropriate for HP to provide to a customer or prospective customer once or twice during an ongoing relationship could appear inappropriate if they were provided more frequently. As another example, it may be acceptable for an HP sales representative to invite a customer to join in attending a sports event as an occasion for enhancing a business relationship, but it would be unacceptable to provide the customer with tickets for the same event if no one from HP planned to attend it.

## *Do additional rules apply in dealing with government employees?*

Under the U.S. Procurement Integrity Act and regulations relating to U.S. government procurement, you may not give government employees anything of value, such as business gifts, meals or entertainment, except that you may generally give them inexpensive promotional items, such as HP calendars or coffee mugs. In many cases, U.S. government contractors and state and local governments have similar restrictions with regard to gifts, meals and entertainment for their employees, and it is your responsibility to know and observe any restrictions adopted by the customers with whom you deal.

Most other countries do not have an absolute prohibition against providing gifts, meals or entertainment to government employees. Nevertheless, you should always exercise greater restraint in dealing with someone who represents the government or a government-owned company than in dealing with someone from a private enterprise. In all cases, worldwide, you must adhere to any published code of conduct as well as accepted local business practices.

### 1.3.5  Personal Use of HP Resources

## *May I use HP computers, communications systems and other HP resources for personal messages, personal access to the Internet or other personal use?*

HP provides a wide variety of assets as resources for its employees in conducting company business – including computers, communications systems and other equipment and materials. Although an HP employee may, at times, use many of these resources for incidental personal activities, this personal use should be kept to a minimum. Excessive personal use of HP resources can adversely affect the employee's performance, increase HP's costs, and reduce availability of the resources for HP's business needs.  As an example, while an HP employee may sometimes need to use an HP telephone for a short call on a family matter, it is not appropriate to use HP telephones for frequent, extended or unusually costly calls that do not relate to company business.

While you may occasionally use HP's electronic systems to send personal messages or to access Internet materials that are not directly business-related, these personal applications should be minimized in accordance with these principles, even if your personal activity takes place after your working hours or involves HP systems that are available for your use at home. In addition, certain messages and materials simply must not be sent or accessed on HP equipment or through HP systems; these include messages for personal gain, solicitations, chain letters, and threatening, sexually explicit or harassing materials. You must not use HP resources to create, transmit, store or display messages, images or materials in any of these categories. Misuse of HP assets is misconduct, and may result in termination of your employment.

HP's Information Technology organizations publish standards and policies that promote appropriate use and security for HP's electronic systems. You should be aware of these policies and comply with them fully. They offer guidance on usage of HP's networks and systems, passwords, electronic mail, voice mail and the Internet. If you are in doubt about HP's expectations in these areas, you should contact your local information technology staff for assistance.

### *Does HP have the right to check on personal use of company assets?*

Since HP's computers, communications systems, desks, lockers, cabinets and other equipment belong to our company. HP may access all such resources at any time. Although HP employees may at times use these assets for incidental personal purposes, they remain company property and are subject to company control even when they are secured by locks, passwords or similar devices. You should not have any expectation of personal privacy in any HP property, including electronic mail, voice mail and computer records stored on HP equipment. HP may, for example, sometimes check usage of its information systems to correct network problems or to establish proper use and security. You should not have any expectation of privacy for messages or other files that you send, receive or store on these systems.

For reasons related to safety, supervision, security or similar concerns, HP may inspect persons and property (including, for example, vehicles, desks, lockers, cabinets, briefcases, toolboxes and personal effects) on HP premises at any time and without notice.

## 1.3.6   Copyright Compliance

### *How should I treat publications and software that may belong to other companies?*

Copyright laws protect books, articles, paintings, cartoons, photographs, videos, music, software and other forms of expression from copying for either commercial use or other purposes. For example, copyright laws usually prohibit private scanning or photocopying of an article or cartoon. HP has invested substantial amounts of money in its software products and other copyrighted materials. We expect others to honor our copyrights, and we honor the copyrights of others.

You are responsible for complying with copyrights for software installed at your desktop or on network areas under your control. Under no circumstances may you duplicate, install or use software in violation of its copyright or applicable license terms.

You are also responsible for complying with copyright rules with respect to books, articles, images, videos, music and other forms of expression, whether they are in hardcopy or electronic media. You should not copy these items for your own use or for HP's use unless proper permission has been obtained.



Conduct Involving HP

# Conduct Involving Competitors, Resellers, and Customers

**2.1   DEALING WITH COMPETITORS**

## 2.1.1   General Policy

Antitrust laws protect the competitive process by prohibiting agreements between competing firms that would eliminate or restrict their competition with each other.

Hewlett-Packard must never make agreements with its competitors that set prices, limit output, divide territories or allocate customers for competing products or services. Agreements of this kind are illegal and can be punished by significant fines, large damage awards, and, in some cases, criminal sanctions, including prison sentences. It makes no difference that an agreement might have a reasonable purpose, such as preventing overproduction.

Basic antitrust principles apply throughout the world, and the rules outlined in these Standards of Business Conduct apply to all HP entities, regardless of location. However, the details of competition laws are not always consistent from country to country. If you are conducting business outside the United States, additional laws and regulations governing competitive practices may also apply to you. The competition laws of the European Union are especially important.

You should contact your local HP attorney if you have questions about our company's obligations under the competition laws in your country.

## 2.1.2   Contacts with Competitors

### *When I deal with HP's competitors, what should I avoid?*

In contacts with competitors, you should avoid discussing non-public or future price information, terms of sale, costs, margins, inventories, marketing plans or similar confidential information, because in most cases it would be unlawful for HP and the competitor to make agreements about their plans on these subjects.

HP and its competitors must never make agreements with each other to set or stabilize pricing for their respective products or services. This is particularly critical where an HP reseller, customer, or supplier in one activity is an HP competitor in another activity. For example, if an HP supplier also sells products that compete with HP products, HP and the supplier must not coordinate pricing for HP's products and the supplier's products.

Agreements that violate competition laws may take many forms. An unlawful agreement may be formal or informal, and may be written, oral, or simply based on shared understandings. You should never assume that an understanding with a competitor is free from antitrust problems merely because of its informality.

### 2.1.3 Trade Associations

#### *How should I act in organizations that include HP competitors?*

Our company routinely meets with its competitors in trade associations, standard-setting bodies, professional committees and the like. These activities are useful and appropriate, but can also present problems. If a group brings HP together with its competitors, there's a risk that the participating companies will be accused of using their meetings to reach anti-competitive agreements.

HP must never participate in group activities designed to injure another company. For example, HP must not participate in standard-setting that is manipulated to create an unnecessary disadvantage for another company's products.

Before our company joins any activity involving its competitors, you should seek the guidance of HP's Legal Department to verify that HP's involvement relates to legitimate purposes. If an organization that includes competitors changes its purpose or direction, you should contact the Legal Department regarding the change in circumstances. Further, if a competitor uses a legitimate forum to discuss subjects that are off limits - such as future prices, terms of sale, allocation of customers or other prohibited topics - you must refuse to participate, and if the discussion continues, you must leave the meeting immediately.

### 2.1.4 Obtaining Competitive Information

#### *What limitations should I consider when trying to obtain competitive information?*

Our company must have timely and complete information about industry developments in order to stay competitive. However, we must obtain this information fairly and legally.

You may properly review public information, such as published specifications, trade journal articles, and materials that a competitor has released to other companies without restrictions.

You must not obtain non-public information by illegal activities involving industrial espionage or by asking a competitor's employees or contractors, or former employees or contractors, to violate their obligations regarding the competitor's confidential data. Actions that would be unacceptable if pursued by HP are still unacceptable if HP uses outsiders such as consultants or friends in undertaking them.

You should not examine information about competitive proposals or products that was submitted to customers, resellers, suppliers or others with the understanding they would treat it as confidential. For example, you should not ask a customer to share information that an HP competitor gave the customer under the terms of a nondisclosure agreement.

You should not misrepresent who you are or for whom you work when you ask for competitive information, and you should not allow anyone acting on HP's behalf to engage in similar misrepresentations.

#### *What competitive information is off limits in sales to the government?*

If you seek or obtain proprietary or source-selection information from government employees or employees of prime contractors in the course of a U.S. federal procurement, you are violating the Procurement Integrity Act. It is equally inappropriate to obtain confidential information from government employees in other countries.

## 2.2   Dealing with Resellers

### 2.2.1   General Policy

Our resellers and other channels of distribution help Hewlett-Packard succeed. It is essential for HP to manage and assist resale activity by all appropriate, lawful means.

At the same time, resellers are independent businesses, and agreements that restrict their activity may, in some cases, violate competition laws, particularly where those agreements control resale prices. Agreements with resellers that are permitted under one country's laws may sometimes be forbidden under another country's legal system.

### 2.2.2   Resale Price Maintenance

#### *May HP dictate resale prices for HP products?*

HP may influence resale prices in many legitimate ways - for example, by suggesting resale prices or price ranges - but you should seek legal advice before imposing limitations on resellers that could restrict their pricing decisions. Under the competition laws of the U.S. and most other countries, HP may not compel resellers to charge minimum resale prices set by HP. Moreover, since HP cannot implement or enforce agreements that control resale prices, HP should avoid following up in any way on one reseller's complaints about another reseller's pricing practices.

### 2.2.3   Managing Resellers

#### *Is HP free to choose and manage resellers as it wishes?*

In the U.S., HP usually may be selective in choosing customers and resellers. If HP decides not to do business with someone, HP is not required to explain its decision, and the best practice is not to do so.

In other countries, notably in Europe, HP's options may be more limited. You should not plan a selective distribution program or any restrictions on resale networks without appropriate legal guidance. Territorial limits on resale activity that may be acceptable in the U.S. may be unlawful in Europe.

In all countries, you should consult HP's Legal Department before you terminate HP's relationship with a reseller if there's any indication the reseller may not agree with HP's decision.

### 2.2.4   Price Discrimination

#### *May HP offer different prices or support to different resellers?*

Offering different price structures or differing levels of promotional support to resellers that compete with one another may be unlawful both in the U.S. and elsewhere unless the differences fit within narrow legal parameters. You should seek legal advice when designing any marketing strategy that might result in different treatment for competing resellers, or when a particular reseller asks for non-standard pricing or assistance.

**2.3    DEALING WITH CUSTOMERS**

### 2.3.1    General Policy

You must deal fairly and truthfully with Hewlett-Packard's customers and resellers. HP must maintain the highest standards of integrity when making claims about its products and services, emphasizing the quality and value that HP can offer, and avoiding unfair or disparaging comments about competitors.

### 2.3.2    Advertising

#### *Are there guidelines for HP advertising and other competitive statements?*

All HP advertising and promotional material must comply with HP's policies and guidelines on advertising and promotion. Statements made in advertising, promotional material and product packaging must be fair, factual and complete. Unfair, disparaging and unprofessional comments about competitors and others outside HP should be avoided even in messages, reports, slides and other materials that are intended for HP's internal use.

In the U.S., all advertising and promotional claims, including comparisons with competitive products or services, must be formally substantiated with current factual data before publication. In the European Union, beginning in 2000, comparisons must comply with local laws implementing the European Directive on Comparative Advertising. In some countries, comparative advertising is subject to stricter rules, or may simply be unlawful. You should consult HP's Legal Department before running advertising or releasing materials outside the U.S. if the ads or materials include product or service comparisons.

### 2.3.3    Tying

#### *What should I know about "tying"?*

"Tying" is a refusal by a company that has an exceptionally strong market position to sell a unique, highly desirable product or service unless a customer also buys a second, separate product or service. Tying agreements may be unlawful if they force customers to buy a product or service they would prefer to obtain from another source. Although HP is generally free to offer a package price for two or more bundled products or services, it sometimes may be necessary to make them available separately, particularly if selling them only on a bundled basis would foreclose market opportunities for smaller competitors.

Conduct Involving Competitors, Resellers, and Customers

### 2.3.4  Government Procurement

## *What additional rules apply in sales to the U.S. government?*

HP employees and all others acting on HP's behalf who sell HP products or services to the United States government, or who deal with government employees or with firms that bid or work on government contracts, must follow additional rules and standards. Among other subjects, these rules cover the need to disclose certain pricing information, restrictions on use of consultants, and prohibitions on improper receipt or use of confidential procurement information.

The U.S. Procurement Integrity Act and related government regulations prohibit offering or giving gifts or gratuities to government employees, offering employment to procurement officials, or soliciting or obtaining proprietary or source-selection information from government employees or prime contractors. You must comply with these provisions.

You may not directly or indirectly pay HP funds or private funds to federal agencies, officials or employees to further HP business. You may not provide anything of value, including business gifts, drinks, meals, travel or entertainment, to U.S. government employees. (An exception is generally made for advertising novelties of minimal value, such as calendars or coffee mugs.) Government employees are ineligible to win drawings or raffles associated with trade shows, product surveys and the like; in planning such activities, you must ensure they do not participate. They may attend HP-sponsored seminars at no charge only if all other participants may attend at no charge. They may not, in any case, receive meals or travel at HP's expense in connection with such a seminar. Similar prohibitions may apply by agency rule or company policy to employees of companies that bid or work on government contracts.

Conduct Involving Competitors, Resellers, and Customers



# Conduct Involving Suppliers

## 3.1   General Policy

Hewlett-Packard's relationships with suppliers are of great strategic importance. You must use common sense, good judgment and the highest standards of integrity when you deal with suppliers.

## 3.2   Choosing Suppliers

### *What factors should I consider in choosing an HP supplier?*

You are not obliged to deal with all potential suppliers, and you are not required to award our company's business to a supplier based solely on the lowest price or the fact that the supplier is also a customer. At the same time, HP's good reputation with suppliers depends on making choices based on the merits. You must avoid decisions that could appear to be based on personal favoritism or other factors unrelated to HP's best interests.

Procurement decisions should reflect your best judgment about a supplier's technology, quality, responsiveness, and delivery capabilities as well as cost. The supplier's financial stability, environmental performance and track record are other factors that may be considered. While you cannot avoid making subjective judgments on some of these issues, you must avoid any appearance that one supplier has an advantage over another because of gifts or favors to HP employees, or even strong personal relationships between the supplier's people and HP representatives.

In the United States, you should actively seek out small, minority-owned and women-owned suppliers, and encourage them to become qualified and submit quotations. These suppliers should be considered qualified when their technology, quality, responsiveness, delivery, financial stability, environmental performance and prices can meet HP's needs within a reasonable time. You should follow similar policies where appropriate in other countries.

You should not establish or maintain a business relationship with any supplier if you believe that its practices violate local laws or basic international principles relating to labor standards or environmental protection.

## 3.3   Formal Bids

### *How are formal bids different from other purchasing situations?*

When you invite potential suppliers to participate in a formal bidding process, you must follow the procedures you define and announce for the process. If you say HP will give all participating suppliers the same information, you must fulfill that promise. If the resulting submissions reflect a discrepancy that suggests one supplier has misunderstood our company's requirements, you must give all suppliers the same clarification of our requirements and the same opportunity to revise their bids.

In other, less formal, purchasing situations, we have greater flexibility, but we must still fulfill any expectations we create for whatever process we've chosen. You should be aware of industry customs as well as HP's past practices in dealing with the supplier, and you should clarify any expectations that may not match with your plans.

Conduct Involving Suppliers

### 3.4    Handling Information from Suppliers

#### *How do I handle confidential information from a supplier?*

You should not accept sensitive information from a supplier unless a Confidential Disclosure Agreement has been signed (see Section 1.2.5: Receiving Sensitive Information). Information from suppliers can be disclosed to other HP entities if disclosure is consistent with the purpose for which the information was provided and is permitted under the terms of any applicable confidential disclosure agreement.

#### *How should I treat information regarding a supplier's prices?*

HP ordinarily does not enter into confidentiality agreements covering a supplier's prices, although in some instances the terms of our company's purchase contracts require us to treat information about prices as confidential. In the absence of any agreement on the issue, HP has no legal obligation regarding the information. However, non-standard, negotiated price information is usually competitively significant, and, with rare exceptions, sound, ethical business practice requires you to refrain from disclosing one supplier's prices to another.

If your division is deciding whether to buy products from an outside source or another HP division, you may disclose the outside company's price to the other HP division if doing so is consistent with any applicable confidential disclosure agreement and any expectations created by HP. The prices that HP pays for components should not be revealed to any HP subcontractor without written approval from HP's Director of Procurement.

### 3.5    Supplier Prices

#### *Are there rules regarding the prices suppliers charge HP?*

You are free to ask suppliers for their best prices for materials and services that HP uses or incorporates in its products, even if those prices are more favorable than prices available to HP's competitors. In contrast, when you buy a product that HP resells without substantial added value, U.S. law may prohibit receiving a discriminatory price. Consult HP's Legal Department if you are purchasing products for resale and you are offered a non-standard price.

Finally, you should consult the Legal Department before entering a group purchasing agreement with HP competitors that would control prices to be paid by the members of the group.

### 3.6    Customer References

#### *What if a supplier asks me to endorse its products or services?*

Our company's policy is that HP's name may not be used in a supplier's or consultant's advertising, promotional materials, customer references or the like without the written approval of the user entity's general manager and marketing manager. Use of HP's logo is seldom permitted, and should never be considered without consulting HP's Legal Department.

Managers should be cautious about approving use of HP's name in exchange for a discount or other incentive, because the benefits to one part of HP from the discount or incentive may be outweighed by the impact on other parts of HP with regard to our company's reputation and our relationships with competing suppliers.

**Conduct Involving Suppliers**

# Relationship to Other Policies

These Standards of Business Conduct define Hewlett-Packard's expectations of its employees, worldwide, in dealing lawfully and ethically with competitors, resellers, customers and suppliers, safeguarding HP's assets, and protecting the company against fraud and corruption. However, these standards are not the exclusive source of guidance and information on HP's expectations.

HP's Corporate Objectives commit our company to conducting its business with uncompromising integrity. The Corporate Objectives address other, related values as well. For example, our objectives include creating an inclusive work environment that benefits from diversity; building positive, long-term customer relationships characterized by mutual respect; and being a good corporate citizen in every country and community in which we do business. In keeping with these further objectives, the company has adopted additional policies with regard to such issues as prohibition of employee harassment, environmental compliance, safety, product stewardship, and other corporate responsibilities.

Violation of these Standards of Business Conduct is regarded as misconduct, and may result in immediate termination of employment. In general, misconduct is harmful or illegal activity that involves or affects HP. In addition to violation of these standards, misconduct includes, among other things, theft, falsification of records, involvement with unlawful drugs, unauthorized use of alcohol, violence, threats, harassment, possession of weapons and insubordination. For further information about HP's expectations on these issues, you should consult HP's Personnel Policies and Guidelines.

Each employee has an important responsibility to help maintain HP's reputation for the highest standards of integrity. If you have any questions, contact your supervisor, your Human Resources Department or HP's Legal Department for information and assistance.



Relationship to Other Policies

